(No. 22817.—■)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS J. LEHNE *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1935—Rehearing denied April 9, 1935.*

632

HARRY FAULKNER, for plaintiff in error Thomas J. Lehne; HAROLD J. BANDY, for plaintiff in error Gertrude Puhse.

OTTO KERNER, Attorney General, LESTER GEERS, State's Attorney, and J. J. NEIGER, (AUSTIN LEWIS, of counsel,) for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

In January of 1934 Charles Puhse and his family resided in Granite City, Illinois. He was then forty-eight years old, and his wife, Gertrude, to whom he had been married twenty-five years and who was his junior by four years, lived with him. Of this marriage two children had been borne—Mildred, aged twenty-two, and Earl, aged nineteen. Both of these children lived with their parents. In the early morning hours of the 26th of that month Puhse was murdered in his bed, being instantly killed by a 32-calibre revolver bullet fired into his temple while he slept, from a gun in the hands of the defendant Thomas J. Lehne. For this crime Lehne and the wife, Gertrude Puhse, were jointly indicted in the circuit court of Madison county, two counts of the indictment charging murder and the third count conspiracy to commit murder. A trial

was had in that court, which resulted in a general verdict of guilty as to each of the defendants, in which verdicts the jury fixed the penalty for each of them at death. The record of this trial is now before us for review upon appropriate writs of error granted by this court.

Briefly summarized, the evidence shows that some considerable time prior to the killing of Puhse the two plaintiffs in error (who will be referred to as the defendants) became enamored of each other and entered upon a clandestine love affair, which started with automobile rides and progressed to the point where the defendant Mrs. Puhse upon two different occasions left her husband and went to live in adultery with the defendant Lehne, first in Granite City from June 16, 1933, until August 16 of the same year, and again in East St. Louis from the latter part of August, 1933, until October 10 of the same year. This open life of adultery appears to have ended by reason of fear on the part of the principals that they might be prosecuted criminally therefor, and on October 10, 1933, Lehne took Mrs. Puhse from East St. Louis to the home of his sister in Venice, Illinois, from which place she returned to her husband. From then until the murder she appears to have continued to entertain her co-defendant clandestinely until the tragic climax to their affair. A further motive for the murder appears in a considerable amount of insurance upon the life of the deceased. This motive was not greatly stressed at the trial.

The defendants were arrested shortly after the homicide, and on February 5, 1934, each of them made very full and complete statements covering the facts in the case. The first statement was made by Mrs. Puhse, consisting of six typewritten pages, each page signed by her and each page also signed by six witnesses, being the State's attorney of Madison county, the sheriff of the same county, an assistant State's attorney of that county, a deputy sheriff of that county, and the mayor and a police officer of Granite

City. Each statement was further sworn to before a notary public. The statement of Mrs. Puhse, greatly condensed, is substantially as follows: After outlining their marital status, the names and ages of her children, place of residence, etc., she proceeds to tell of her first acquaintance, flirtation and illicit relations with Lehne. After these relations had continued for about five years, she stated, Lehne asked her to write letters to him suggesting plans whereby her husband might be killed so that the situation would look like a hold-up, and that she wrote several such letters to him and spoke to him about the matter. She stated she wrote several letters in which she suggested that her husband could be killed by someone and she would say that two negroes came to the house for the purpose of robbery and that they had killed her husband in carrying out this intent. She mentioned other plans that had been written about and discussed between them, and stated that Lehne had told her he was getting tired of waiting for the event, and that if she did not fix it up soon so that the husband could be killed he was going to kill her and then kill himself. The statement goes on to say that on January 25, 1934, which was the day preceding the night in which Puhse was killed, Lehne came to her house in the afternoon and asked her where her husband kept his gun, and that she told him it was kept in the bed-room closet, on a shelf. She said that at that time Lehne was there about fifteen minutes and that he looked so wicked that she was afraid of him, but she again repeated the statement that her husband kept his gun on the shelf of the closet in the bed-room. At that point the statement relates that a caller arrived with samples of soap for sale and that her attention was temporarily taken up with the caller at the back door, during which time Lehne was in the front hall, thus by implication giving him an opportunity to get the gun without her knowledge. After another interruption by her son coming in to get his coat in order to go after the

daughter, who was at work, and during which time she says Lehne stepped into the bed-room, she says that Lehne told her that he was not going to put this killing off any longer and that that very night he was going to end it by killing Puhse himself. She then stated that he instructed her, before leaving, to leave the front door open for him that night because he was going to come in, and that if he did not come through the door he would come through the window, it being his intention to kill her husband that night. The statement proceeds to relate a trip to Edwardsville made by the family that night, their return about midnight, and her husband immediately going to bed and to sleep. It then states: "When we went to bed I saw to it that the front door was left unlocked in compliance with my agreement and promise made to Tom Lehne on the afternoon of Thursday, January 25, 1934." Proceeding, she states that she went to bed with her husband in the back bed-room, and at that time she expected Lehne to come in and kill her husband; that she fell asleep but immediately awoke; that she then went to the kitchen to get a drink of water, turned the light on in the kitchen, got the drink of water and then walked to the front door, it having been, as she says, her intention at that time to lock the door; that just as she reached the door she saw Lehne come up onto the front porch; that he opened the door, walked in and told her to beat it; that she started to go in her bed-room, and got as far as the foot of the bed, thinking, as she says, she would warn her husband, but then thinking further that if she did there would be a terrible fight between her husband and Lehne; that she then got excited and turned around to go back out of the room, but at that time Lehne was in the room, and that just as she turned around Lehne fired the first shot; that she then ran out of the room and into the front bed-room with her children, pulling a Victrola in front of the door after shutting it; that she did this because in the afternoon Lehne had

told her that Earl, her son, had better not see him do the killing, and that she moved the Victrola so that Earl could not get out of the front bed-room in time to see Lehne, and that her daughter got out of the front window and called the police and the doctor. · At the close of her statement she says that when Lehne was at her house in the afternoon he told her that during the night, after everybody was in bed, if the situation was right for him to come in and kill her husband, she should turn the light on in the kitchen twice. The statement proceeds: "But I turned it on only once. He told me to flash the light twice, but I only turned it on once and left it burning and walked toward the front door, intending to lock it, and as I reached the front door I saw Tom Lehne come up on the porch, and he entered the house and did the killing as was stated. I think it was the first shot fired that killed my husband."

After this statement of Mrs. Puhse had been signed by herself on all of its pages, and likewise by all of the witnesses, it was sworn to before a notary public. Thereupon Lehne was called into the room with the witnesses and Mrs. Puhse and her statement was read to him. During this reading Mrs. Puhse was present with the other witnesses. While the statement was read Lehne held a copy of it in his hand and followed the reading. During this time he made small pencil dots in the margin of her statement at eight different places on the six different pages. At the conclusion of her statement he was asked what he had to say about it, and he said, "I will tell you all about it." The evidence shows that he thereupon took the typewritten statement of Mrs. Puhse as a form and from it dictated his own statement in his own words. It is worthy of note that the original statement which he then held in his hand has been certified to this court for our inspection, and we find but eight pencil marks along the right-hand margin on the six different pages. None of them are near a material or important point.

After Lehne had dictated the opening portion of his statement the State's attorney suggested that Mrs. Puhse go out of the room and that she could be called back when his statement was finished, to which Lehne replied, "No; I want her right here, so that she can hear it and correct me if it is wrong." She remained during the dictation of the entire statement and made occasional interjections to it as will be hereinafter noted. Lehne's statement, in substance, was as follows:

"I, Thomas J. Lehne, hereby make the following statement voluntarily, of my own free will and accord, knowing full well that I do not have to make any statement and being fully advised of my constitutional rights to make this statement or not, as I see fit, and knowing that anything that I say in this statement may be used against me. I am forty-three years of age, a widower. * * * I have known Gertrude Puhse six years. I met her by her coming over to my filling station and then by an invitation to come to her home."

Mr. Geers: "I am going to make a suggestion right here that Mrs. Puhse go out of the room, and then when your statement is finished we will call her back and read it to her.

Mr. Lehne: "No; I want her right here, so that she can hear it and correct me if it is wrong. I don't remember calling Gertrude Puhse on the phone prior to the time that I met her, and on three occasions we were out in my automobile before we had any understanding of any kind. I do not know of any time that she has refused to step out with me. In fact, she insisted upon stepping out with me. When I sent her home—I told her to go home after I had talked to Austin Lewis, assistant State's attorney, after I had been arrested in September, 1933—they thought they had a Mann act charge against me, but she and I did not go to St. Louis. * * * I told her she would have to go home. * * * Up until October 23, 1933, I had

not heard from her, and I took my baby to Winslow, Indiana. On returning home my little niece brought me a letter from the post-office from Gertrude Puhse—or she signed it, 'Your little brown-eyed wife.' I didn't answer that letter. I received a letter then every four days until November 13, and in that letter she asked me to write her just one letter, which I did. * * * Then she began writing me, asking me to write to her and telling me about different things that were happening, and she couldn't live and that her life was terrible. And in this next letter after November 13, 1933, she said, 'Why can't something be done? I could say two negroes came to the door, and when Charlie opened the door I would say he tried to shut the door and they shot him.' I paid no attention to that, because I knew that was dangerous stuff. These letters continued coming like that. In the next letter she suggested that I might park my automobile somewhere in the middle of the block and she would take her husband, Charles Puhse, up to Skidmore's and somewhere in the middle of the block he could be killed, and she would say two negroes also done that, in a Ford car. She wanted to know then what could be done. She said that all they could say was that it was a stick-up or a hold-up. She asked me to write her one more long letter, if I wasn't afraid, and give it to Johnnie Devany instead of putting it in the post-office and let him slip it to her at Kate's—Kate Ryckman's. I didn't write that letter so that Devany could deliver it but I wrote the letter and mailed it at the post-office, general delivery. The next letter I received from her she said that if something wasn't done she was going to kill herself; that something had to be done; that Charlie had to be gotten rid of. She said that 'it may be funny to talk this way but I love you.' All these times I would tell her, 'Now you look for it to-night, because they will be there to-night,' but I never sent anyone. I never hired anyone. The next letter I received from her told me that if I would come to Twenty-

fourth and "I" streets, in Granite City, she would meet me there; that she wanted to see me. That was on December 12, 1933. I drove up there and met her, and we drove out on the hard pipe-line road and stood there until 4:00 o'clock in the afternoon, and then I brought her back. The next letter that she wrote to me she said her and Earl had the devil—that he was afraid of his father. She said that she had also written me a note that her and her boy were having trouble, and Charlie (meaning her husband) found the note; that he came to the basement and asked her if she was meeting me out again, and she said she didn't know what to say. The next letter she told me to try some other method. I told her in this long letter to her that I was afraid there was a leak of some kind and that it would be dangerous, and she wanted to try some other way. So it went on that way until two weeks before Christmas, 1933, and I met her on Wednesday at 1:30 P. M. at Twenty-fourth and "I" streets, in Granite City, and we drove to my sister's house in Venice. We went to my sister's room and there she told me that something had to happen—that she had to have Billy and me. Billy is my baby. And I told her then, when she got back home, to look for two men that night. I said they will stand you up at the front door and there will be a regular stick-up. But I didn't send anybody. After it didn't happen [she wrote me and wanted to know why it hadn't happened. I got two letters that day. She told me she was running across Washington avenue to mail them, (stop me whenever I make a mistake, Gertie,) and she wanted to know in that letter why it hadn't happened. [She said that everything was surely in its favor."

Mrs. Puhse: "I never said any such thing.]

Mr. Lehne, continuing: "She said that Charlie Puhse, her husband, was a brute to her and had been for twenty-five years. She told me that the best thing to do was not to let the kids know she was seeing me because she didn't

want the kids to know any more, and that I could meet her in the garage when the boy went to get his girl. And I told her that there was some sort of a slip. I thought perhaps it would be dangerous to write letters maybe, and so we put a brick in the garage and she was supposed to put her letters under the brick, but I would always be there and she would hand them to me. Sometimes I would answer them with a note, and she cautioned me in every letter she wrote to be sure and burn them; that there were things in them that would cause us both trouble. That continued on up until Monday, two weeks before Charlie Puhse was shot. [According to her letter that she handed me in Venice at the school house she gave her husband a dose of poison—

Mrs. Puhse: "You are lying."

Mr. Lehne, continuing: "He told the people next door and Howard Jones that whatever was in his coffe was what had done it. He asked her what she had put in his coffee, and she told him she hadn't put anything in it."

Mrs. Puhse: "We drank out of the same coffee pot— poured the cups together."

Mr. Lehne, continuing: "Well, didn't you give me a letter down at the school house, while you were on your way to East St. Louis, that you tried that?"

Mrs. Puhse: "I don't remember that."

Mr. Lehne, continuing: "Well, we are gone. There is nothing that can save us, so you just as well be square. She said that she put the stuff in his coffee when he went down in the basement to fix the furnace, and that when he came back he took a sip of it and that he got blind and stiff; that that happened at 10:00 o'clock and that he didn't get out of it until 3:00 o'clock A. M.] She suggested also in that letter that I might have them held up coming from the Laclede Steel—make them all get out of the car, have him shot and have the car go back toward East St. Louis. I told her that that was a mighty, mighty dangerous thing—

mighty dangerous. So she showed me the lay of her bed-room, it being composed of just the bed, and she had it at that time standing crosswise of the room, and in her note to me she suggested she would move that back to the window, and have the window unlocked so someone could stand on a box, shine a light on Charlie Puhse's face and kill him. The next night she told me that the windows worked too hard and made too much noise and that she would make some other arrangements to get into the house. So on Wednesday before the Thursday he was shot I came up the back way, and she saw me, and the kids were in the garage fixing covers on the car, and she motioned for me to go around in front, and I went around in front [and she gave me Charlie Puhse's gun."

Mrs. Puhse: "He wanted to see it."

Mr. Lehne, continuing: "And she told me to be sure and get all finger-prints off of it."

Mrs. Puhse: "I never gave you anything at all."

Mr. Lehne, continuing: "But she didn't want it done that night because she didn't have her front room cleaned."

Mrs. Puhse: "I never wanted it done."]

Mr. Lehne, continuing: "She handed a little note to me telling me to meet her at 4:30 in the garage Thursday afternoon, and I got to the garage at 3:00 o'clock and Earl Puhse and his girl were out in the garage with their automobile. She motioned to me to come around in front. I came around in front. She showed me how she had the bed set—where he, Charlie Puhse, would sleep—and said that she would try to stay awake until 1:30."

Mrs. Puhse: "You asked me to."

Mr. Lehne, continuing: "That she tried it the night before but she just couldn't hardly stay awake. The gun was down at my mother's. I went back home and ate supper, went to bed, got up at 11:00 o'clock, walked to Madison, bought two drinks of whisky at Steve's place, between Market and Second, on State street, a drink of whisky at

Eighth and "I" streets, a drink of whisky at Shannon's, then went over and stood in the garage at Puhse's house. [Gertrude Puhse had told me in the afternoon that when everything was all right she would raise the back curtain in the kitchen—

Mrs. Puhse: "I never told him no such a thing."]

Mr. Lehne, continuing—"and she said she would turn the light on twice."

Mrs. Puhse: "That was all his plan."

Mr. Lehne, continuing: "If she turned the light on twice everything was all right. At exactly 1:30 o'clock A. M. Friday morning, January 26, she came to the kitchen, raised the shade, flickered the light, turned the light on once then turned it off, then turned it on again and then turned it off. She had told me in the afternoon that if she turned the light on just once, or left it on, that things were not right for the killing. I then went around the house to the front door, where she met me, [and I asked her if she was sure she wanted this done, and she said, 'I surely do; I can't live without you and Billy.' "

Mrs. Puhse: "There was nothing like that at all."

Mr. Lehne, continuing: "I said, 'Where is he at?' I said, 'How is he sleeping?' and she said, 'I think he is lying on his stomach.' Then she came back and put her arms around me and said, 'Tom, be sure you don't make no mistake, because if he don't die it will be too bad for both of us.' So I sent her back again, asking her where and how he laid, and when she came back to me then I asked her again if she was sure she wanted this done, and she said she would be the happiest woman in the world."

Mrs. Puhse: "There was nothing said like that at all.]"

Mr. Lehne, continuing: "I told her when this is done don't have Mercer, because it may cause an investigation because of the fact Mercer is of different politics. She said all of those things were exactly the way she wanted them. I went in and stood at the bed, and I couldn't reach

him, so I put a knee upon the bed. She, Gertrude Puhse, was standing in the door of the bed-room. The curtains were up and the light from outside was shining in the room, and I fired one shot into Charlie Puhse's head—in the right temple—which I supposed killed Puhse. I turned and fired another shot [like Gertrude Puhse had instructed me to] into the wall."

[Mrs. Puhse: "I never instructed you to do that. You done all of that planning yourself."]

Mr. Lehne, continuing: "I picked up Charlie Puhse's hand and put the gun in it and left. [As I went through the door Gertrude Puhse said to me, 'Don't make any noise, Tom.']"

[Mrs. Puhse: "I was in the front room when you went out, with my kids."]

Mr. Lehne, continuing: "What she did from then on I don't know. * * * I went out the back way and walked home and sneaked in the house, and my dear old mother thinks I was never away from it."

In addition to the statements of the defendants the People produced the evidence of the doctor and police officers who were called at the time of the homicide; also the testimony of the coroner, the officers and others present at the taking of the statements, and in addition thereto the testimony of certain other witnesses to whom Lehne is claimed to have made incriminating statements and propositions before the trial. One of these witnesses was John Nickoloff, who testified that Lehne had tried to hire him to kill Puhse some time previous to the actual murder. At the time of his testimony he was under indictment for the crime of robbery while armed, had confessed and was awaiting sentence. We have not found it necessary to give any particular consideration to his testimony, which was denied by Lehne. The People also produced the testimony of Ethel Beatty, a niece of the deceased, who

testified to having seen the defendants in intimate and affectionate positions; James Aldrich, who testified to having seen Lehne at the Puhse home several times, and in rebuttal certain evidence intended to impeach the defendants. Among these rebuttal witnesses were Sam Wilson, a negro, and Emma Farmer, a fortune teller, who were called for the purpose of impeaching Lehne's statement that he had not tried to hire either of them to kill someone for him.

The defendant Lehne introduced three witnesses for the purpose of attempting to impeach the witness Nickoloff, and also testified in his own behalf. The defendant Mrs. Puhse testified in her own behalf, and also offered the testimony of Viola Everetts, who testified that Lehne had tried to see Mrs. Puhse the morning after the homicide but that she had refused to see him, and further, that Lehne at that time said that he had "killed the son-of-a-bitch; he should have been killed long ago." She also offered the testimony of her son and daughter to the effect that she was in the front room with them at the time the second shot was fired. This is substantially all of the evidence.

Upon the trial Mrs. Puhse offered no objection to the admission of her own statement, but on the statement of Lehne being offered she objected to it, as did also Lehne, and Lehne also objected to the statement of Mrs. Puhse. The objections of Mrs. Puhse to the statement of Lehne were based principally upon the ground that she had not acquiesced in it, but, on the contrary, had in substance denied it all. In support of that claim her counsel went through the statement, as appears from the bill of exceptions, and picked out and pointed out to the court the various places at which she had disagreed with him, all of which are shown in the statement of facts above printed. The record does not show any specific objection to certain words and phrases nor any request that the court delete any particular part of it but the objection was to the whole

statement. The court did, however, delete those portions of the statement which are shown in brackets above, and those parts were never read to the jury.

Lehne's objections to the statement of Mrs. Puhse were that he had contradicted her statement in part, and in the language of his counsel, "for the main reason that the statement was contradicted during the time it was read to Lehne, and for the further reason that it was entirely contradicted in his remarks, as substantiated by the statement where he said, 'Now I'll tell it all,' or 'Now I'll make a statement,' or words to that effect." Lehne objected to his own statement for the reason that he claimed it was not voluntarily made but was secured under duress and through fear and intimidation, and that he had suffered physical violence prior to its being secured and was threatened with more if he did not make the statement. On this contention of Lehne the court heard evidence out of the presence of the jury. Upon this hearing the evidence for the People showed that the statement was made in the presence of Al Rowden, a police officer of Granite City; Harry Odum, deputy sheriff; A. M. Jennings, mayor of Granite City; Austin Lewis, an assistant State's attorney; Peter Fitzgerald, sheriff of Madison county, and Lester Geers, State's attorney for Madison county, all of whom, except the State's attorney, testified that the statement was freely and voluntarily made and dictated by Lehne himself, and that he suffered no violence nor did they see any marks or signs of any. Lehne himself testified that he had been struck, shoved violently into a chair and otherwise mistreated, but upon this question the weight of the evidence was so conclusively against him that the court was fully justified in admitting the statement in evidence. Other points in this connection will be noted later in this opinion.

In his own behalf, and on direct examination, Lehne testified at great length as to his relations with Mrs. Puhse substantially as stated in his written confession. He told

of all the letters which had passed between them and testified that he had burned those which she wrote to him. He stated that he had made various efforts to break off the affair, and testified that on the 25th of January, when he went to her home, he had told her definitely that that was the last time he would see her. He stated that that afternoon was the last time he went to the house, and that he did not shoot the deceased. He testified before the jury, as he did before the court, that he had signed the statement because of his being beaten and hammered, and denied in detail the testimony of Nickoloff about attempting to hire Nickoloff to kill Puhse. On cross examination, and on being asked the direct question, "Who killed Charlie Puhse?" he replied, "I can't say or won't say at this time; I can't." He admitted that he made the statement attributed to him which was admitted in evidence and that he signed it. He further admitted that he dictated it in the presence of Mrs. Puhse and the other witnesses, and also that before he made it her statement had been read to him and that he held a copy of her statement in his hand while he dictated. During this examination he was taken, sentence by sentence and paragraph by paragraph, over his entire statement and admitted dictating all of it. As to most of it he not only admitted dictating it but admitted that it was true. As to other portions which were damaging in their nature he admitted the dictation of the statement but denied its truth, saying that he had signed it under compulsion. At these points his testimony becomes nearly incoherent. It was probably completely disregarded by the jury as it is entirely unconvincing, and one cannot read it in full without coming to the conclusion that the written statement was true and his efforts to deny it merely desperate attempts to avoid the impending consequences.

Mrs. Puhse testified in her own behalf, but, like her co-defendant, Lehne, a summing-up of her testimony shows no material variation from the written statement which

she had signed. Like Lehne, also, on cross-examination she admitted the making and signing of the entire statement. She made no claim as to having been beaten or otherwise abused. Before the commencement of the trial, and again when the written statements were offered in evidence, this defendant moved for a separate trial, which motion was denied and the denial is assigned as error. The two defendants have prosecuted separate writs of error and are represented in this court, as they were in the trial below, by separate counsel.

A decision in this case requires that an answer be made to three principal questions: First, did the court err in refusing the motion of Mrs. Puhse for a separate trial; second, did the court err in admitting the statement of Mrs. Puhse as against Lehne; and third, did the court err in admitting the statement of Lehne as against both of them? Except for minor points to be hereinafter noticed, these are the only matters necessarily involved in a decision of the case. No complaint is made as to the instructions given the jury, nor is it even argued that the murder was not planned and accomplished as outlined in the foregoing statement of facts. It is only urged seriously that inasmuch as the jury fixed the penalty at death when it might have inflicted a lesser punishment within a wide range, a new trial should be granted in which the claimed errors could be eliminated.

The answer to the first question above indicated is necessarily largely dependent upon the answers to the second and third, and we will therefore consider first the rulings of the court upon the admissibility of the statements.

The objections of Lehne to the statement of Mrs. Puhse are based upon the familiar ground that no one can confess for another, and that statements charging another with the commission of a crime, which are not made in his presence, are not binding upon him, are strictly *res inter alios* and are not admissible in evidence against him.

*People* v. *Buckminster,* 274 Ill. 435, and other cases, are cited in support of this argument. Conceding the soundness and justness of this rule, however, does not help the case of Lehne. The statement of Mrs. Puhse, although originally made out of his presence, was repeated to him in his presence and in the presence of six other witnesses. At that time he not only heard it read but had in his hand a typewritten copy of it, on which he followed the reading and made marks as he saw fit. He not only did not repudiate the confession which she had made for him as well as herself but proceeded forthwith to ratify and confirm it in all its essential details by dictating his own version of the facts involved, calling on her for coöperation— "correct me if I am wrong, Gertie,"—and receiving an occasional correction from her, as shown by his statement printed above.

It is a rule which has long been followed in this State that an admission may be implied from the conduct of a person remaining silent when charged with a crime or of complicity therein, or when statements are made by third persons in his presence affecting him, when the circumstances afford him an opportunity to act or speak in reply and men similarly situated would naturally deny the guilt imputed or make explanations as to the statements. (*People* v. *Tielke,* 259 Ill. 88; *Ackerson* v. *People,* 124 id. 563; *O'Hearn* v. *State of Nebraska,* 79 Neb. 513, 25 L. R. A. (n. s.) 542, and extensive review of authorities in note thereto.) If a defendant thus charged with crime unequivocally denies it and this is the whole of the conversation or statement, it cannot be introduced in evidence against him as an admission, but if he makes a reply admitting the truth of the statement, either wholly or in materially incriminating parts, both the statement and his reply thereto are competent evidence. *People* v. *Harrison,* 261 Ill. 517; *Commonwealth* v. *Trefehen,* 157 Mass. 180, 31 N. E. 961.

The statement of Lehne, in so far as it was denied by Mrs. Puhse, was not read to the jury, those parts included within the brackets above being suppressed by the court. It is our opinion that when Lehne completed the dictation of his statement, doing it, as he did, directly from the face of and in answer to the statement of Mrs. Puhse, it became, as deleted, competent evidence as against both of them. It is further our opinion that her statement, together with his answer to it and explanation of it, likewise became competent evidence against both parties. It is to be noted that his objection to her statement was as to the whole of it. We are not deciding but that certain words or sentences in it might properly have been deleted before going to the jury had specific objections been made to those portions. (*McCann* v. *People,* 226 Ill. 562; *People* v. *Anderson,* 239 id. 168.) Those parts, however, were only as to collateral details not material to the ultimate facts and were fully answered and explained in Lehne's own statement. No advantage to him would have been gained by such objections and deletions had they been made, which is possibly the reason for his counsel having allowed them to pass unchallenged.

Our holding in regard to the admissibility of the statements of the parties is, in effect, determinative of the question presented as to the granting of a severance. The general rule is that persons jointly indicted shall be jointly tried, (*People* v. *Birger,* 329 Ill. 352,) and it is only in those cases where fairness to one or more defendants requires it that a severance is imperatively required. The determination of this question is governed by the facts in each case and the motion is addressed to the sound discretion of the trial judge. (*People* v. *Kelly,* 347 Ill. 221; *People* v. *Birger, supra; People* v. *Covitz,* 262 Ill. 514; *People* v. *Gukouski,* 250 id. 231; *Gillespie* v. *People,* 176 id. 238; *Doyle* v. *People,* 147 id. 394.) As recently as the case of *People* v. *Fisher,* 340 Ill. 216, we said: "An ap-

plication for separate trial is addressed to the sound discretion of the court and is not a matter of right. Unless that discretion is abused the decision of the trial court is not subject to review." We have held, however, that this discretion is not arbitrary but judicial in its nature; and that under certain circumstances it is error to deny a severance. Any set of circumstances which is sufficient to deprive a defendant of a fair trial if tried jointly with another or others is sufficient to require a separate trial, and on the other hand any reasons falling short of this measure do not necessarily require a severance. On this principle it was held by us in *People v. Rupert,* 316 Ill. 38, that a severance should have been granted where the defenses of the defendants were antagonistic and each had made a statement denying his own guilt and accusing his co-defendant, these statements constituting the principal evidence relied on by the People. In *People v. Sweetin,* 325 Ill. 245, we reached the same conclusion and for the same reason. In that case the defendants were jointly indicted for the murder, by arsenic poisoning, of Mrs. Sweetin's husband, which it was shown might have been committed by either one of them. Each defendant denied guilt, blaming the other, and the co-defendant Hight signed a confession admitting the murder of his own wife, denying the one for which he and Mrs. Sweetin were being tried and affirmatively asserting that he had delivered the arsenic to her. So, also, in *People v. Rose,* 348 Ill. 214, we decided that fairness required a separate trial. Rose and Eckford were jointly indicted for murder and a motion for a separate trial was made by Rose. The affidavit of his attorneys supporting this motion stated that Eckford would testify that he was not present at the time of the shooting and that Rose would testify that the shot was, in fact, fired by Eckford. We held that upon this showing a severance should have been granted even though the inconsistency did not actually arise on the trial by reason of the failure

of Rose to testify. We found that his failure to testify may well have been caused by the very failure to grant him a separate trial and the consequent embarrassment to the attorneys in attempting to present inconsistent defenses to the same jury. The judgment was reversed for that reason. These are the principal cases relied upon by the defendants here, and to them more might be added. All are illustrative of the principle uniformly adhered to by this court—*i. e.,* that a separate trial should be granted when fairness so requires. The case at bar presents no such requirement. Neither defendant had any defense antagonistic to the co-defendant. They were in complete accord as to their long continued illicit relationship, as to their having discussed the murder of Puhse and as to Lehne's firing the fatal shot. We are satisfied that the rule of fairness has not been violated and that the trial court did not abuse its discretion in refusing to grant separate trials.

Upon the motion for a new trial an affidavit was filed on behalf of Lehne to the effect that the witness Viola Everetts had stated to the attorney for Lehne that she wished to change the testimony she had given on the trial by omitting therefrom that part of it in which she testified that Lehne told her he had shot Puhse. The affidavit recited that the witness at the time was in a hospital, and that she could be procured a little later to make the affidavit herself if more time were given. This was denied by the trial court and the motion was overruled. Its action in this respect is assigned as error, but we do not agree with the contention. The testimony to the effect that Lehne had told the witness that he had shot Puhse was merely cumulative to the other evidence in the case, and no different result could be expected from another trial if she either did not testify or testified omitting that particular statement. Furthermore, her testimony was given on May 14, 1934, and the affidavit was not filed until the 21st of September of that year. The affidavit disclosed that the

attorney had received the information in August, and no reason appears why her affidavit could not have been procured in ample time for the hearing, more than a month later, had it been desired.

It is also urged that the court erred in permitting certain questions, on cross-examination, as to the contents of letters which passed between the defendants. The evidence shows that these letters had been burned, and the contention of plaintiffs in error that it was error to permit cross-examination on them because the letters themselves would have been the best evidence is therefore not sustainable.

It is also urged that the verdict in this case is the result of passion and prejudice on the part of the jury and that they were inflamed by reason of the claimed errors. Upon the whole record we are satisfied that there was no prejudicial error and that the defendants had a fair and impartial trial in accordance with the applicable principles of law. Such feeling as the jury may have had in the matter is readily understandable upon consideration of the competent evidence. The infliction of the extreme penalty for so malicious and revolting a crime is neither unusual nor unjust.

The judgment of the circuit court of Madison county is affirmed, and the 19th day of April, 1935, is fixed as the time when the original judgment and sentence of death shall be carried into effect.  *Judgment affirmed.*