(No. 23838.— )

The People of the State of Illinois, Defendant in Error, *vs.* Mildred Bolton, Plaintiff in Error.

*Opinion filed December 10, 1936.*

Benjamin C. Bachrach, and Lester N. Grossman, for plaintiff in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, A. B. Dennis, and Wilbert F. Crowley, (Edward E. Wilson, John T. Gallagher, Richard H. Devine, Melvin S. Rembe, and Morris G. Meyers, of counsel,) for the People.

Mr. Justice Orr delivered the opinion of the court:

Mildred Bolton was indicted in Cook county for the murder of her husband, Joseph W. Bolton, Jr. After a jury trial a verdict of guilty was returned fixing her pun-

ishment at death. This writ of error was obtained to review the judgment of the criminal court.

Mr. and Mrs. Bolton had been married approximately fourteen years before the shooting. No children had been born to them. Their married life in its later stages was not harmonious, and in January, 1936, he had filed a bill for divorce from her on the ground of cruelty. On June 15, 1936, she went to his office to receive a temporary alimony payment and while there she shot him with a revolver. He was taken to a physician's office in the same building, where he died a few minutes afterward. She was arrested and taken before an assistant State's attorney, where she made a written exculpatory statement. At the trial her testimony in chief was to the general effect that she had a quarrel with her husband which ultimately led to a scuffle over the possession of the revolver and that during this struggle the weapon was discharged. This story was completely discredited by her own testimony upon cross-examination and by the direct testimony of her husband's secretary, the only other eye-witness to the shooting. A reversal of the judgment and sentence is here sought principally on the grounds that the evidence did not establish the defendant's guilt beyond a reasonable doubt, and that the imposition of the death penalty clearly shows the jury was swayed by passion and prejudice. The errors alleged and the gravity of the case compel us to state the evidence in greater than usual detail.

At the time of his death Bolton was engaged in the insurance business as an agent or broker and operated a partnership with Louis Schilts in a suite of rooms on the tenth floor of the Insurance Exchange building, in Chicago. In order to establish a motive the People introduced evidence of disputes between Bolton and his wife as far back as 1928. In that year the Boltons were dinner guests at the home of a man by the name of Ladd, who was then employed by the same company which employed Bolton. Ac-

cording to Ladd, Mrs. Bolton became greatly enraged because a daughter of the witness worked for her husband. When Bolton tried to quiet her she attacked him, and after it became necessary to eject her from the house she stood outside, screaming. Ladd said he also witnessed a quarrel between the two in the lobby of the office building in June, 1933. She was then slapping and punching Bolton while he was trying to hold her hands. Some time later, when Ladd asked her why she got after her husband, Mrs. Bolton said, "I guess I am insanely jealous." There was testimony for the People that Mrs. Bolton also attacked her husband with a razor in the month of July, 1934. He was injured in this attack and had to be taken to a hospital, where he remained five days. Mrs. Bolton expressed sorrow over this affair to Ladd and besought his aid in locating her husband. Florence Stulv also witnessed the trouble between the Boltons in the lobby of the building in June, 1933. She said Bolton was holding his wife by the wrists and she saw numerous slashes on his face. At that time Mrs. Bolton was screaming and struggling in an effort to get loose from her husband.

Louis Schilts, the partner of the deceased, told of an occasion when he witnessed a quarrel between the Boltons in the office in December, 1935. Both were scuffling in the reception room, and he told them it would have to stop. Mrs. Bolton then held the wrists of her husband as he tried to eject her from the room. When the witness threatened to get a policeman Mrs. Bolton threw a tray at him, which he dodged, the missile breaking a glass panel in a door. Mrs. Bolton often visited the office, the frequency of the visits increasing after the first of March, 1936.

Roy Swanson said he once intervened between the Boltons when they were fighting in a fifth floor corridor of the office building. Mrs. Bolton included him as an antagonist by forcibly grabbing his tie and holding on. With the aid of others the witness and Bolton then placed her

on an elevator and took her to the ground floor. There the chief elevator starter lent his aid in getting her to the sidewalk. She turned on him and struck him in the face before she was finally placed in a patrol wagon.

Joseph Lynch, a police officer, said that in July, 1934, he was called to a drug store about 3:00 o'clock in the morning, where he found Bolton suffering from a cut in the arm. He took the wounded man to a hospital and returned to the store. Taking up the trail of blood spots from the store he followed them to the Bolton home, where he found Mrs. Bolton sitting in the parlor smoking a cigar. In response to his queries she informed the officer that her husband had cut himself while shaving at 3:00 o'clock in the morning and he had gone to the drug store on her advice. She was taken into the presence of her husband while he was being sewn up at the hospital, but the latter refused to prefer charges against her.

Peggy O'Neil testified that she was working on the fifth floor of the building in June, 1933, as a switch-board operator for the same insurance company for which Bolton then worked. At this time Mrs. Bolton presented herself to the witness, introduced herself and then attacked her, tearing off many of her clothes and then kicking her in the abdomen. Mrs. Bolton at the time accused witness of going out with her husband. This the witness denied she had ever done. The witness had Mrs. Bolton placed under a peace bond, and Bolton soon afterward lost his position with the company because of the actions of his wife.

Marie Harned, married and the mother of a twenty-year-old-son, Charles, testified that she was acquainted with Bolton, having met him through a mutual friend in June, 1935. She had been in his company after that on social occasions and was not aware he was separated from his wife. She had been in Bolton's office only once, and that time was the occasion of a reception on the opening of the partnership office. The record shows that Bolton was liv-

ing in the VanBuren Hotel in June, 1936, and that the son of Mrs. Harned had Bolton's permission to occupy the room. On June 10 Mrs. Harned went to the hotel to meet her son. As they were leaving the place, a woman, whom she afterward learned was Mrs. Bolton, followed them and annoyed her by stepping on her feet. The witness turned on the woman and asked her to disclose her identity, which she did and then accused the witness of seeing her husband, which was denied. Mrs. Bolton gave the witness a tongue-lashing, calling her a street-walker and other similar epithets. Charles thereupon slapped Mrs. Bolton, and he was arrested at her behest. Bail was furnished by Bolton, and upon trial Charles was fined $100 after Mrs. Bolton testified against him. This fine was later vacated, but this fact was not known to Mrs. Bolton, who felt certain that it would be paid by her husband. This trial was held on the morning of June 15, the same day Mrs. Bolton shot and killed her husband.

Andrea Houyoux, the secretary of the partners, testified to the following important matters which in point of time occurred prior to the shooting: Mrs. Bolton had admitted to her the breaking of glass in the office doors on two occasions, the last one being when she threw the tray at Schilts. In the first week of January, 1936, Bolton had secured the issuance of an injunction against his wife restraining her from bothering him and ruining his business. The witness said that on one occasion that month Mrs. Bolton was in the office when a man entered and left after a few minutes. She then informed the witness that the man had served an injunction writ upon her, which she tore up. About two weeks before June 15 the witness came down to the office in the morning and found the door of Bolton's private office closed. A chair was before the door and it held Mrs. Bolton's coat. No one came out of the private office all morning, and a short time after the witness had returned from lunch she heard Bolton say

he wanted to leave the office. Some scuffling then ensued, but she could not hear any conversation. The door of Bolton's private office contained a panel of glazed glass, which could not be clearly seen through although it would show the silhouette of a person close to it. She saw Mrs. Bolton's form as she leaned against the door. The witness left the office, and when she returned a few minutes later she tried to enter the office but found the door locked and heard Mrs. Bolton say, "Not yet." The witness again left and returned after a few minutes and Bolton asked her to enter. One of the two let her in and she found both struggling. Mrs. Bolton held her husband by the lapels of his coat and he was trying to break her hold. He pulled a long knife from his pocket and in the presence and hearing of his wife said to the witness: "Look, Miss Houyoux, this is what she came up here with." The wife then said, "I told you I was going to kill you," and Bolton replied, "I wish you would hurry up and get it over with." During this struggle Bolton continued his efforts to break the hold of his wife and he struck her. When she started to cry he told her to go to Dr. Smith's office, which she refused to do, even refusing the request of the witness to do so. The Boltons later left the office together, but upon his return to the office that day the witness noticed that Bolton's hands were cut and showed evidences of medical treatment.

Gentry Burress was an elevator man in the office building. On the morning of June 15 he was on duty running an elevator. He testified, in substance, to the following actions on the part of Bolton and his wife that day, prior to the shooting: He first took Bolton to the tenth floor. Later Bolton got on the elevator of the witness at the ninth floor and said, "Shoot me up to the eleventh floor." The witness had a signal to stop at the tenth floor. He stopped at that floor and had opened the elevator door about six inches when Mrs. Bolton tried to force her way into the car. Bolton then said, "For God's sake, close that door!

She will kill us both. God damn it, I told you not to stop here. She will shoot us both." As the witness closed the elevator doors Mrs. Bolton pulled her hands away, shook her fist and said, "God damn it, I will fix you."

In respect to the facts immediately surrounding the killing the People had to rely upon the testimony of Andrea Houyoux, as she, aside from the defendant, was the only eye-witness. Her testimony, in substance, was, that Mrs. Bolton entered the office on June 15, 1936, carrying a large purse and told of a young man assaulting her two or three nights before. He had just been tried and fined $100. Bolton then entered and went immediately to his private office, followed by Mrs. Bolton, who left the door between the private office and the reception office open. The witness was seated at her desk and could see and hear all that occurred in the private office. Mrs. Bolton started telling her husband about Charles Harned being fined $100 as the witness left and went to the eleventh floor of the building to carry a message from Bolton to his lawyer, Edward Steinke. From that floor the witness went to a wash-room, where she stayed for about five minutes and then returned to the office, where she found the Boltons in the corridor. She continued on to the office, and Mrs. Bolton soon returned and said she knew her husband was going to pay the fine and that she was going to follow him. Mrs. Bolton then left the office, and soon afterwards Bolton returned and called the witness into his private office to take dictation. While they were engaged at this task Mrs. Bolton came in the private office and asked Bolton if he had seen her alimony check. He replied that he had given it to her and she had placed it in her purse. She remarked she must have lost the check and started looking around the office. He told her he did not want her snooping around the office and not to go into Schilts' private office, towards which she was then searching. She then started to enter the corridor and Bolton began to look for a number in the tele-

phone directory. When she observed his action she returned and tore a page from the directory. Bolton then dismissed the witness and she returned to her seat beside the desk in the reception office while Mrs. Bolton remained in the private office, ostensibly searching for her check. Mrs. Bolton then came into the reception office and by motion of her mouth indicated to the witness that she should leave the office. This the witness did, going to the washroom, leaving Bolton at his desk in his private office and Mrs. Bolton in the reception room, with the door between the two rooms remaining open. The witness soon returned and saw Bolton still at his desk and his wife standing in front of it, facing him, with her back to the door and the witness. The witness seated herself at her desk, evidently without Mrs. Bolton being aware of her presence. She heard Mrs. Bolton say, "So you are going to pay the fine, ha?" Immediately following the words she heard a shot, the noise of which came from Bolton's private office. After the first shot the witness stood up and saw Bolton fall from his chair to the left, and as he fell she heard five more shots. During all this time Mrs. Bolton was standing in front of the desk. After the shots the witness heard two clicks. She immediately backed toward a door which led to an adjoining vacant office and stood there. While so positioned she heard Mrs. Bolton say, "Close the door," and Bolton then said, "No, open the door." Immediately thereafter Mrs. Bolton came out of the private office, half running and half walking, going toward the door from the reception office to the corridor. She was carrying a gun in her right hand. The witness then ran into the vacant office, then to the door thereof which led into the corridor, and from there into an open elevator which happened to be at the tenth floor. This carried her down-stairs, where she reported the shooting to the building electrician. Miss Houyoux further testified about prior threats made by Mrs. Bolton to kill her husband. She testified that in November, 1935, while con-

versing with the witness, Mrs. Bolton said she was going to kill her husband, and the threat was repeated in a conversation some three weeks later. A third threat was made to her in the early part of June about killing her husband. This last threat was made during a discussion the witness had with Mrs. Bolton about the exoneration of Betty Martin on a murder charge in January by a jury, when Mrs. Bolton remarked, "They just don't convict women in Cook county." During the course of one of the three threats Mrs. Bolton particularized as to the means she would use in killing her husband, saying she would buy a gun and "do it good and proper."

Lincoln Knutson, operator of an elevator in the building, testified he took his elevator to the tenth floor right after the shooting. When he stepped out he saw Bolton lying on the floor. The witness procured two doctors and a nurse from offices in the building for the wounded man. Mrs. Bolton was standing close by her husband when witness heard him say, "Don't let her get this, she got me, Doc. I guess I am through." Just before he said this Bolton had handed a gun to a doctor. When moved to the office of Dr. Smith, Bolton was accompanied by police and his wife. Emergency treatment was given, but the wounded man died in a few minutes.

Fred Ferguson saw Bolton on the corridor floor and Mrs. Bolton near by. He heard him express fear of her, and she said in reply, when they were in the elevator, "You are not hurt so bad. Oh! you are only bluffing. You are not hurt as bad as you pretend."

James Deppish conversed with Mrs. Bolton after the shooting, asking her how it happened. She said, in effect, that she and her husband were scuffling for the gun and it went off, and that he was not hurt.

H. I. Smith, one of the doctors called to attend Bolton and to whose office he was taken, testified that he saw him lying in the corridor holding a gun in his right hand, while

Mrs. Bolton stood a few feet away. Bolton then expressed fear of his wife.

Evelyn Healy saw Bolton in the corridor and heard him say: "She got me, and I am a-goner. Keep that woman away from me." Similar utterances were made by Bolton in the elevator and in Dr. Smith's office. Dr. M. J. Werner heard him say he feared Mrs. Bolton as he was being treated after the shooting. Both doctors testified to treating Bolton some two or three weeks before he was shot, for lacerations of the hands. While they were in Dr. Smith's office Mrs. Bolton asked Joseph Weber, a police officer, how badly her husband was hurt. He told her she should know, as she shot him, to which she replied, "The dirty rat."

Matthew J. Kiley, a coroner's physician, testified he examined the body of the deceased and found it marked by bullet wounds. The fatal bullet entered the chest, nearly passed through both lungs in pursuing a right to left path across the body in an upward direction. There was an utter absence of powder burns.

Dr. Clarence Muehlberger, a chemist, qualified on the stand as an expert in respect to the use of fire-arms on the human body. The witness examined the clothing worn by Bolton when killed. He testified specifically as to each item of clothing which bore bullet marks. None of the clothing bore marks of powder around any of the places where bullets entered the clothing. He said such a revolver as used by defendant must be held eighteen inches, or closer, to the clothing to mark it with powder burns, hence the defendant stood far enough away from her husband, when shooting him, to keep the muzzle at least eighteen inches from him.

Harold Goldberg, a pawnbroker of Gary, Indiana, testified that on June 11, 1936, Mrs. Bolton came into his shop and expressed a desire to purchase a gun. He exhibited several to her and she selected the one with which she afterwards killed her husband. It cost $10 and the

six cartridges for the same twenty-five cents. She paid $5 down at the time and did not take the gun away with her but did take the cartridges. On June 13 she returned, paid the remainder of the purchase money and took the gun with her. She used the name of Sarah Weston, and he issued a receipt to her under that name. On viewing the defendant at the police station and pointing her out as the woman he sold the gun to, he testified that she laughed and said, "I never saw that man before in my life."

Mrs. Bolton testified to marital trouble with her husband over other women prior to their moving to Chicago. She also testified that he had been very attentive to Peggy O'Neil, a witness for the People, saying she first became acquainted with his alleged indiscretions with this woman through Mary Stuckel, of Joliet. About three years prior to the shooting she said she had visited the apartment of the O'Neil woman and saw her husband there around 11 :00 o'clock in the night. A general quarrel took place, and she was finally prevailed upon to keep quiet, as both would lose their positions if she pressed the matter. The next tale of indiscretion concerned Marie Harned. The defendant said she first saw her in her husband's office in August, 1935, sitting on his lap. In January, 1936, she said she found them occupying the same room in the Kenwood Hotel. He placed his companion in a shower cabinet and the defendant in a closet, but not before she had reached the telephone and called the manager. The manager came to the room, but Bolton succeeded in placating him. The defendant related that she told the manager that Marie Harned was in the shower cabinet, undressed, and that he knocked on the cabinet door but she would not come out. She said it was shortly after this episode that Bolton filed his suit for divorce. She denied assaulting Marie Harned and her son, Charles, in front of the VanBuren Hotel. After signing the warrant, she stated, she followed Charles Harned to a tap room, where he met his mother and Bolton. Marie

Harned came from the tap-room and assisted her son in assaulting the defendant. On the day Charles was fined she went to her husband's office to collect her alimony. Before doing so she telephoned the office and asked him if he had money for her. When she entered the office he was seated at his desk in his private office and he gave her a check for $10. When she remonstrated that the check should have been for $20, he told her it was all she was going to get. The argument continued over the amount of the payment until attorney Steinke came in, and Bolton told him to go up-stairs and he would soon follow. She and Bolton left the office together and went around to the side of the building, where he ran away from her. She returned to the office and told Miss Houyoux that he had run away from her. Nearly an hour later she said her husband returned to his office, and she then accused him of paying the fine of Charles Harned. He replied, "That's what you think," and another argument started, during which Bolton said, "You are just a dirty old bitch." She repeated the phrase after him several times, picked the revolver out of a box on the desk and pointed it at him. She fired several times and he fell to the floor. He arose, came to her and requested the gun. They struggled for the possession of the weapon, which he finally secured and left the office with it. Thereupon she went into the other private office in order to kill herself by jumping out of the window. She heard her husband screaming in the corridor and ran to him. She saw the gun on the floor beside him and reached for it, but he succeeded in grasping it before she did. In her exculpatory statement she did not tell where she had procured the revolver. On the contrary, she stated that her husband had the gun, and during their altercation he had advanced toward her holding it in his hand. A struggle for the weapon took place, she alleged, during the course of which the gun was discharged. On direct examination she was asked concerning these particular statements, and

admitted she had not told the assistant State's attorney the truth. Her reason for not doing so was because that official had not allowed her to tell of the events which led up to the shooting.

Mrs. Bolton admitted telling Miss Houyoux, upon several occasions, of her intention to kill her husband. She justified these threats upon the belief the secretary would tell him and he would become frightened and return to her. She contradicted the testimony of Ladd as to what occurred at the dinner party in 1928 by saying that no unpleasant episode took place outside of the fact that she strongly stated her opinion of certain girls working in offices. She did not remember the time when Bolton told Miss Houyoux she tried to kill him with a knife. She did remember her own injury during that struggle as related by Miss Houyoux, although she denied ever seeing her husband with cuts on his hands. She recalled the time Bolton was taken to the hospital suffering from a cut on his arm, but said he entered the house about 4:00 o'clock in the morning and said he had been held up in front of the building and cut. She then sent him to the corner drug store, and soon afterward officers came to the house and made inquiries. A denial was made that the officer who testified to the visit was ever at the house at the time or that she told them her husband had cut himself while shaving or that she was smoking a cigar at the time. Her visit to the hospital the next morning was made of her own accord she said, and not in the company of officers. She denied saying to her husband, in their presence, "Did you say I cut you?"

Upon cross-examination Mrs. Bolton changed in many important details the story she gave on direct examination. She originally denied ever fighting with Peggy O'Neil. She denied the fight with her husband on the fifth floor of the building, or that she was taken to the ground floor, where she was said to have fought with building employees and then put into a patrol wagon. Swanson, she said, did not

tell the truth, for she never had a fight with him. Under cross-examination she stuck to her story that her husband and Peggy O'Neil had been keeping company for a year, at least. Her acquaintance with that person was personal, she said, for she had often talked with her and her husband in an endeavor to break off their affair Pressed for particulars regarding her husband and Peggy O'Neil and being in their company, she finally said she was with them on Labor day of 1933 or 1934.

Under questioning by the People Mrs. Bolton admitted she went to the check room of the Great Northern Hotel on the termination of the Charles Harned case on June 15 and withdrew a suit-case she had checked there. She took from the case the revolver she had placed therein earlier in the morning, before going to court. She admitted she carried the revolver to her husband's office. As the cross-examination continued she admitted not securing the revolver from the suit-case until after she had first gone to the office after her appearance in court and had obtained the alimony check for $10. After getting this check she went to a bank and cashed it, obtained the revolver from the suit-case and returned to the office for the purpose, as she expressed it, of killing herself in the presence of her husband, thereby carrying out her intent to embarrass him. She denied directing Miss Houyoux to leave the office, but, on the contrary, she said she told her not to leave for there would be no trouble. The admission was made that she told the police Miss Houyoux was not in the room when the shooting took place, although she said that as a matter of fact she was present. She admitted she entered Schilts' private office and there inserted the cartridges in the revolver while Miss Houyoux was out of the office. This act, she said, took place just a few minutes before the shooting, at the time she was called a "dirty bitch" by her husband. As soon as the revolver was loaded she returned to the private office and started shooting as she entered. The

revolver was reposing in a box on Bolton's desk, she said, while they were talking, and the revolver in its container was not taken into Schilts' office until her husband left for a few minutes. If the defendant is to be believed she did not form or have the intention of using the weapon on the deceased at the time she loaded it but did intend to use it on herself. She said no cause existed, up to the time of loading the revolver, which created an intention in her mind to kill her husband. A short time later in the cross-examination she gave another version of what transpired immediately prior to the shooting. This time she said that instead of advancing toward the private office with the loaded revolver and starting to fire it as she entered, she replaced the revolver in the box and carried both into the private office. Both she and her husband entered the private office at the same time. He seated himself in his chair back of the desk, and the shooting did not start until he called her a "dirty bitch" and she had removed the loaded revolver from the box.

To rebut the testimony of the defendant, which contradicted the testimony given by witnesses for the People, several additional witnesses were called. Flory Mills testified he was manager of the Kenwood Hotel in January, 1936, when he saw Mrs. Bolton in her husband's room. This witness denied seeing Marie Harned at any time, and said she was not in the room at the time set by Mrs. Bolton. Instead of finding Marie Harned locked in the shower cabinet he said he found Mrs. Bolton in there with the clothing of her husband. He said no other persons were in the room and that he stayed there until the Boltons had left. Lawrence Jones, assistant manager of an insurance company, testified that Bolton left the employ of the company because requested to do so, and that he was discharged because Peggy O'Neil, their switch-board operator, complained of threats by Mrs. Bolton. Mary Stuckel testified she lived in Joliet, and denied that she ever, at any time or on any

occasion, told Mrs. Bolton anything concerning Peggy O'Neil and Bolton. The witness said she worked for the same company as did Bolton, was his stenographer, never talked with Mrs. Bolton over the telephone or otherwise and had never seen her in person prior to the trial. She was never out with Mrs. Bolton socially, never conversed with her or dined with her husband, and had never seen Bolton at the home of Peggy O'Neil. In rebuttal, Peggy O'Neil also denied ever being in the company of Bolton alone or in the company of his wife. She said that from the time in 1933 when Mrs. Bolton assaulted her she had seen her only twice—once when she came into the office, and the second time when the witness had her arrested for an attack. Marie Harned denied any intimacies with Bolton in his office, or that she ever saw Mrs. Bolton in the Eldorado Hotel, or that she was at the Kenwood Hotel in January, 1936, at the time stated by the defendant.

We have reviewed all of the evidence material to the issue raised by questioning the sufficiency thereof to support the verdict. The evidence produced by the People demonstrated beyond all reasonable doubt that the killing of Bolton was the result of a coolly-premeditated act. The testimony of Mrs. Bolton firmly established the fact that she killed her husband, not because she was overcome by a sudden rage or irresistible impulse to do so but because she deliberately planned the act. The intent to kill him had been in her mind for months, as was shown by her admission of the making of threats to kill. The purchase of the revolver and its secretion in a place convenient to her husband's office, where she could easily procure it at what she deemed to be the opportune moment, were the actions only of a person who had deliberately formed and carried the intent to kill for a considerable period of time. The record discloses no mitigating circumstances. A jury composed of reasonable men could only find the defendant guilty of murder, for by her falsehoods and contradictions

on the witness stand her testimony was rendered unbelievable. The fact that the jury fixed her punishment at death does not in itself condemn their verdict as being one of passion and prejudice. Where the defendant is guilty of the crime charged, beyond all reasonable doubt, this court will not hesitate to uphold the death penalty even though she be a woman. *People* v. *Lehne,* 359 Ill. 631.

The remaining alleged errors are not of sufficient merit to warrant detailed discussion. The taking of the exculpatory statement from the defendant was done fairly and no prejudice can be claimed because it was taken prior to her indictment.

The closing arguments of the prosecutors to the jury have been carefully considered, together with the rulings of the trial court to such parts thereof as were objected to, and on the whole we find nothing of serious or harmful effect. The State's attorney has a right to denounce the defendant, provided such denunciation is based upon the evidence. *People* v. *Rooney,* 355 Ill. 613; *People* v. *Bonham,* 348 id. 575; *People* v. *Preston,* 341 id. 407.

The commission of slight errors in the trial of a capital case, even where the death penalty is inflicted, will not necessarily work a reversal. The purpose of a reviewing court is not to determine whether the record is perfect, but its purpose is to determine whether the defendant has had a fair trial under the law and whether the conviction is based on evidence establishing guilt beyond all reasonable doubt. (*People* v. *Cardinelli,* 297 Ill. 116.) Where it can be said from the record that an error complained of could not reasonably have affected the result of the trial the judgment of the trial court should be affirmed. (*People* v. *Cleminson,* 250 Ill. 135; *People* v. *Halpin,* 276 id. 363; *People* v. *Haensel,* 293 id. 33; *People* v. *Anderson,* 239 id. 168.) A review of the evidence in this case convinces us that the jury was fully justified in finding, beyond a reasonable

doubt, that defendant was guilty, and that she was given a fair and impartial trial.

The judgment of the criminal court is therefore affirmed, and the clerk of this court is directed to enter an order fixing February 26, 1937, as the date on which the original sentence entered in the criminal court of Cook county shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the sheriff of Cook county.

*Judgment affirmed.*