(No. 13473.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH CASINO, Plaintiff in Error.

*Opinion filed December 21, 1920.*

1. CRIMINAL LAW—*defendant is entitled to have jury kept together without requesting it.* In a capital case the right of the defendant to have the jury kept together and in charge of a sworn officer, for the purpose of guarding against improper influences, is not waived because he does not request that the rule be enforced nor because he makes no objection when the court announces it will not enforce the rule.

2. SAME—*when permitting jury to separate is ground for reversal without any showing of prejudice.* In a murder trial the action of the trial court in deliberately allowing the jury to separate and the jurors to go to their meals and to their homes, relying upon their integrity not to communicate with outsiders about the trial, is ground for reversal without any showing of prejudice, even though the defendant made no objection to such action when the court announced its intention. (*People* v. *Strause,* 290 Ill. 259, distinguished.)

3. SAME—*the law of self-defense stated.* A person who is deliberately assaulted in such a way as to make him reasonably apprehensive that great bodily harm will be done to him or his life taken has the right deliberately to defend himself to the extent of shooting his antagonist, if such course reasonably appears necessary.

4. SAME—*when instruction ignoring plea of self-defense is erroneous.* Where the defendant pleads self-defense in a murder trial an instruction stating that malice will be presumed when one deliberately shoots another is erroneous in ignoring the defense so pleaded; and the fact that other instructions may have stated the law correctly does not cure the error, as it is impossible to tell which instruction the jury will follow.

5. SAME—*when giving instructions defining reasonable doubt will not cause reversal.* It is not proper practice to give numerous instructions defining or explaining the term "reasonable doubt," but the giving of such instructions will not work reversal when that is the only error relied upon, unless it reasonably appears that the jury were misled.

6. SAME—*instruction should not take from jury their right to pass on credibility of witnesses.* It is the province of the jury to pass upon the credibility of witnesses and the force and effect of

their testimony, and the court should not in any way invade the province of the jury by telling them in an indefinite way that the testimony of one witness may be more satisfactory or convincing, under certain circumstances, than the testimony of several.

7. SAME—*evidence of condition of family of deceased is not competent in a murder trial.* In a murder trial, evidence as to the circumstances or physical condition of members of the family of the deceased which has no tendency to prove any material matter in issue is not competent.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HARRY A. LEWIS, Judge, presiding.

RICHARD I. GAVIN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Joseph Casino was tried in the criminal court of Cook county for the murder of Henry Hilgert. He was found guilty of manslaughter and was given by the court an indeterminate sentence in the penitentiary. He has filed the record in this court for review by writ of error.

Plaintiff in error proved on the trial his good reputation as a peaceable and law-abiding citizen. His testimony was, in substance, that on August 31, 1918, he left his home about three or four o'clock A. M. to obtain a supply of coal. He returned about 7:30 o'clock that evening with his automobile truck, which he stopped on the street in front of his house, at the mouth of an alley running back from the street, into which he intended to enter for the purpose of putting his truck in his garage. He found the alley blocked by a team of horses and a wagon belonging to the mother of Stephen and Henry Hilgert, the wagon being backed up some distance into the alley and the team facing the street. Mrs. Hilgert was moving out of a house

owned by a brother of plaintiff in error. Several pieces of furniture had been placed against the door of his garage. He asked Stephen Hilgert, whom he found in the alley, to move the furniture over to one side so he could get into his garage with his truck and to move the wagon a little bit. After some talk between them Stephen hit him on the head, and then Henry Hilgert hit him and three times called him a dago son-of-a-bitch. When they began beating him he ran back to his machine, both the Hilgerts running after him. Stephen had a two-by-four piece of timber about four feet long. Plaintiff in error jumped into his truck and got his revolver from under the seat as quickly as he could. Both the Hilgerts were coming for him, Henry being nearest to him. He shot Henry, who fell to the ground near his machine, and then shot the other brother. Stephen was coming for him on one side of his machine, calling him all kinds of names, and Henry was coming towards him from the other side. He fired at them because he saw he was in danger of his life by their attack on him. He had been receiving letters from blackhanders and for that reason was carrying his revolver in his machine. Some of the blackhand letters received by him are in evidence in the record. Henry was killed by the shots fired at him and lay where he fell. Plaintiff in error had previously had a quarrel with Henry but had never had any trouble with Stephen. The only thing he did before the shooting was to politely ask the Hilgerts that the furniture be moved so he could get into his garage, and when he touched one of the articles of furniture to move it they called him names and started for him.

Plaintiff in error is corroborated in a way by a witness for the State, Mrs. Kuhns, who saw the shooting. Her testimony is that she saw two men running from the alley and that the man in the lead fired two shots at the man behind him. The man that was shot fell at the curbing where she stood. She saw only one man shot and she

fainted and fell over when he was shot. She didn't see anything in the man's hand that was shot, Henry Hilgert. He was also somewhat corroborated by the position of the body of Hilgert and by the testimony of George Nealon, who called himself a business police operator. His testimony is that the body of Hilgert was found lying at the mouth of the alley, across the walk and about eight feet from the rear end of plaintiff in error's truck.

Margaret Hilgert, the wife of the deceased, and Stephen Hilgert and his wife, Ida, all testified. · According to the testimony of Ida Hilgert she was in the alley when the shooting occurred. When Casino came into the alley he said to Henry, "I want to pull into this alley." Henry replied, "Just wait a minute, Jack; I will get these pictures out of your way, and if you don't want to wait, pull out of the way; we have the pictures loaded." Casino then said, "To hell with you; I will show you I run this alley," and picked up a picture frame from the furniture and threw it across the alley. He then went towards his auto truck, saying, "I'll get my pick." She then called her husband, Stephen, who was up-stairs in his house adjoining the alley. Casino came back, and as her husband came down-stairs into the alley Casino shot him twice and then shot Henry. Neither her husband nor Henry had any weapon of any kind or club in his hand.

Stephen Hilgert's testimony was, in substance, that he and his brother had the wagon in the alley and had been carrying their mother's furniture to the alley from the house of plaintiff in error's brother on the other side of the alley, from which she was moving. He walked into his own house from a rear stairway going up from the alley and got a cigarette and some water. While in the house he heard his wife calling from the alley. He then returned to the alley down the stairway, his brother's wife, Margaret, following him. When he got down the stairway and about two feet into the alley he heard a shot and the

bullet struck him. That was the first he knew there was any trouble. Casino fired the shot. He had done nothing and had said nothing to Casino and had nothing in his hand, and did not at any of the time have anything in his hand. His brother, Henry, had nothing in his hand and was right behind the wagon, which was backed up in the alley near the garage. He knew nothing after he was shot until he woke up in the hospital.

Margaret Hilgert testified that she was in Stephen Hilgert's house, the rear entrance to which was back in the alley near which the wagon was standing. While in the house she heard Casino talking. Then she heard two shots and started down stairs, Stephen preceding her. She had a baby in her arms. When they got to the door at the entrance of the stairway Casino fired right at Stephen. The ball went through his body and struck the baby on the chin—a glancing blow. Stephen fell down and fainted. She then picked up the baby and ran for the doctor.

John Risberg, a ten-year-old boy whose family was on very friendly terms with the Hilgerts, testified that he saw Casino's machine stop by the curb at the alley. Casino then went into the alley and was gone a few seconds. Then he went back to his machine and took something into the alley and shot the Hilgerts. After the shooting the bodies were lying on the ground and Casino ran to his house. He does not locate the position of the bodies. There is also some testimony in the record tending to show that Casino was in hiding for a few days and then surrendered to the police in the office of his attorney, first notifying the police of his whereabouts.

The record in this case shows that during the trial the jury were not kept together or in charge of a sworn officer. The court informed the jury that he was going to rely on their integrity to not let anything outside the court room affect them one way or the other; that neither counsel had made a motion before him to keep them together;

that it might take two or three days to try the case, and
that for that reason he did not want to keep the jurors
from their homes at night or luncheon engagements at
noon. He then cautioned them not to let anything preju-
dice them in the trial from the outside, and that if anyone
approached them to talk to them about the case, to bring
him before the court and he would deal with him as he
should be dealt with. The record does not show that plain-
tiff in error consented to this action of the court or made
any objection to it. The action of the court in that regard
is assigned as error without any showing by the plaintiff in
error that he was, in fact, prejudiced by the court's action.

Our statute positively provides that all trials for crimi-
nal offenses shall be conducted according to the course of
the common law except when the statute specifically points
out a different mode. This court has at all times recog-
nized the right of the defendant, when being tried for a
capital offense, to have the jury kept together and in charge
of a sworn officer for the purpose of guarding against im-
proper influences which might operate to the prejudice of
the accused. It is a right that should be accorded him in
every trial where he is charged with a capital offense and
without his having to make a positive request that the court
grant him this right. In this case the court stated, in the
presence of defendant and his counsel, that neither coun-
sel had requested that rule to be enforced in this case, and
stated that for that reason he was not going to enforce the
rule. This cannot be taken against the plaintiff in error as
a waiver of his right to have the rule enforced. For him
then to have made a request that the rule be enforced was
in all human probability to be done at the risk of preju-
dicing the jury against him. Men on juries, even in capi-
tal cases, are still men, only, and do not take kindly in all
instances to the enforcing of this rule. They like their lib-
erty even as jurors, and are prone to believe that such a
rule is useless and only an infringement upon their per-

295—14

sonal liberty and perhaps a reflection upon their integrity and ability to act under all circumstances as fair and impartial jurors. When placed under the same circumstances as the plaintiff in error was in this case, any experienced lawyer or judge must concede that it would be better diplomacy for a defendant to not place himself in the position of an objector to the court's action, even though his positive desire and wish might be ever so strong to have the rule enforced and although he might believe that he would be in serious danger of being prejudiced thereby. The court had no right to thus take advantage of plaintiff in error's silence, and the doing so was a violation of the plaintiff's right without any justification whatever. That plaintiff in error may have been prejudiced by the action of the court cannot be gainsaid. All possible chances of the case being prejudiced were taken. The jury had their full liberty during the recesses of the court to separate and apparently to go where they pleased and unaccompanied at any time by an officer. Whether or not the plaintiff in error was actually prejudiced by this action of the court this court can never know, and it is too much to expect of plaintiff in error that he would or could know whether he was actually prejudiced. We must assume in such a case that he was prejudiced, and hold such voluntary action on the part of the court when not positively assented to by the defendant as reversible error.

This court has frequently held that where the jury have been temporarily separated by accident or mistake either of themselves or of the officer in charge of them, or have communicated with other people by their own misconduct or by the misconduct of their officer, such misconduct, alone, is not ground for a new trial. It must be further shown that the accused might have been prejudiced by it; that the jurors might have been tampered with or improperly influenced, or some means exerted over them in consequence of their separation so as to influence their verdict. In most

all of these cases the separation and improper communication with outsiders were merely technical and not real, and wherein the full nature of their conduct and communications was shown and the further positive showing made that the defendant was not prejudiced. We have even announced the rule in such cases that where the separation and communication were by inadvertence or carelessness of the jurors or of the officer, or of both, the verdict will not be set aside unless it is clearly shown the jurors were operated on in some way to the prejudice of the prisoner. Most of the cases were reviewed by this court in the recent case of *People* v. *Strause, 290 Ill. 259,* and the rule is still adhered to in that case that in such cases there must be a showing of prejudice to the defendant where such misconduct was the only error relied on, but that such misconduct would have weight where other errors intervened, in the granting of another trial. But where the rights of the defendant in such regard are completely ignored by the court and the jury are allowed to separate and to communicate with the outside world wherever and whenever they please, without the actual consent of the prisoner, we must hold that such action of the court is reversible error without further showing or other errors.

Plaintiff in error also complains of the giving by the court, for the People, of the following instruction:

"As a matter of law, that to constitute the offense charged in this case, the intent alleged in the indictment is necessary to be shown, but that direct and positive testimony is not necessary to prove the intent; it may be inferred from the facts and circumstances shown by the evidence. And, if you believe from the evidence in this case, beyond a reasonable doubt that the defendant fired the shot, as alleged in the indictment, and if you further find from the evidence in this case, beyond a reasonable doubt, that such shooting was committed deliberately and was likely to be attended with dangerous consequences, the malice or.

intent requisite to make out the case as charged will be presumed."

The first part of this instruction stated the law correctly. The second part practically ignores plaintiff in error's defense, which was self-defense. At the least it was most likely to mislead the jury. It is not denied that the shooting was done deliberately, and it was not only likely to be attended with dangerous consequences but it did produce death. When acting in self-defense, anyone deliberately assaulted in such a way as to make him reasonably apprehensive that great bodily harm will be done to him or his life taken has the right to deliberately defend himself,—that is, to deliberately shoot his antagonist if it reasonably appeared that it was necessary or apparently necessary to save himself from great bodily harm. The evidence for plaintiff in error tended to show that he fired the shot in self-defense. The evidence for the People was contradictory to his evidence, but the testimony of the witnesses for the People is not in harmony. The fact that other instructions may have stated the law correctly does not cure the error in this instruction. This court cannot know which instructions the jury followed. The verdict of the jury may have been a compromise between the two theories of murder and self-defense. The instruction is not cured by the phrase, "as alleged in the indictment." Of course, if the shot was fired in manner and form as charged in the indictment,—that is, with malice,—and the jury had understood that that was what was meant by the words used, the instruction would not be so bad, but they were most likely prevented from taking that view of it by reason of the closing words of the sentence. It simply announces, in substance, that if the shot was fired, and if they believe from the evidence, beyond a reasonable doubt, that it was fired deliberately and likely to be attended with dangerous consequences, the requisite malice to make out a case of murder will be presumed. It was fatally erroneous in view of

the plaintiff in error's defense and virtually nullified that defense.

Instructions Nos. 12, 13 and 14 given to the jury were upon the question of reasonable doubt. They are the usual stock instructions defining the term "reasonable doubt," etc. Complaint is made of the giving of too many of these instructions on reasonable doubt. We have frequently had occasion to say that such instructions do not make more clear than the words themselves the meaning of that term, and that repeated instructions of this character are likely to induce jurors to believe that there was a reasonable doubt of the defendant's guilt when, in fact, there was none. We could not, however, go to the extent of holding that it is reversible error to give such instructions when that is the only error relied upon, unless it reasonably appeared the jury were thereby misled.

The court did not err in refusing to give plaintiff in error's instruction that four or five witnesses may testify to a fact and a single witness testify to the contrary, but under such circumstances and in such manner and with such an appearance of truth and candor as to make it more satisfactory or convincing, etc. It is the province of the jury to pass upon the credibility of witnesses and the force and effect of their testimony, and the court should not in any way invade the province of the jury by telling them in an indefinite way, as this instruction does, that the testimony of one witness might be more satisfactory or convincing to the jury under "certain circumstances." Such instructions are liable to mislead.

The State's attorney was permitted, over the objection of plaintiff in error, to obtain from Margaret Hilgert the statement that she was pregnant, in answer to his question as to what was the condition of her health at the time of the shooting. It is conceded by the defendant in error that this was error. The evidence was entirely immaterial and of a prejudicial character, as it had nothing to do with the

question of the guilt or innocence of Casino. The State's attorney's claim is that it was merely introduced as a matter of family history and to show why she was not helping in moving the furniture of her mother-in-law. Family history of this character tended to prove no material matter in issue, and there was no occasion for showing why this woman was not helping to load or move those goods. There was no reason for the jury drawing any conclusion unfavorably against her as a witness on that ground.

One other question is raised upon the question of evidence, but it was not properly preserved in the record by plaintiff in error and for that reason it will not be considered. No proper objection appears in the record.

For the errors aforesaid the judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*