(No. 25032.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. ROBERT NIXON, Plaintiff in Error.

*Opinion filed April 19, 1939.*

JOSEPH E. CLAYTON, JR., and CHARLES B. EVINS, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and BLAIR L. VARNES, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error, hereinafter referred to as defendant, was, with one Earl Hicks, indicted for the murder of Florence Johnson on May 27, 1938. Hicks pleaded guilty and the cause proceeded in the criminal court of Cook county against defendant Nixon. The jury returned a verdict finding him guilty of murder and fixing his punishment at death. He brings the cause here urging numerous contentions for reversal of the judgment of conviction.

After arraignment, defendant's counsel, on July 13, filed a motion and affidavit for change of venue, naming thirty-nine judges of the superior, circuit, and criminal courts, charging prejudice. On July 16, another motion and affidavit were filed, seeking change of venue from two of the judges of the criminal court of Cook county. The record discloses no action taken on either of these motions, but upon filing the second motion and affidavit the cause was transferred to the chief justice for reassignment, and two days thereafter it was assigned to the Hon. John C. Lewe, judge of the superior court, who tried the cause. Judge Lewe was named in the first motion for change of venue but was not named in the second. No objection appears to have been filed to proceeding with the trial before him. Apparently the motion first filed was abandoned, though it is claimed, here, that a change of venue was denied defendant to his prejudice. A motion for a separate trial was made before Judge Lewe and denied. A petition was filed by the public defender for an inquiry into the sanity of defendant. This motion was allowed, and a hearing was had before a jury impaneled to try the question whether defendant Robert Nixon was sane or insane, or feeble minded. The verdict, on hearing, was that he was sane and not feeble minded.

The undisputed facts are that on the morning of May 27, 1938, at about 5:30, two colored men entered the apartment occupied by Mrs. Florence Johnson, her husband, their two children, and Margaret Whitten, her sister. One of the men went into the room of the deceased and she, becoming aroused by a noise made by him, screamed, whereupon he struck her on the head with a brick, killing her. Within half an hour thereafter, defendant was arrested within a few blocks of the scene of the homicide as he was passing along a street, having stopped in the entrance of the alley to lace his shoes. He was taken to the police station. He had a cut on his index finger and some blood on his clothing, which he said he got dressing chickens. He

gave the name of Thomas Crosby. He later gave police the name of Earl Hicks and told where he might be found. He stated to the officers that he had been at the house where Mrs. Johnson was murdered and that he and Hicks had gone there to steal a radio; that Hicks picked up a brick along the railroad as they were going to the apartment, and that it was Hicks who struck and killed the deceased. When Hicks was brought into the police station, defendant told the officers that Hicks was the fellow who was with him and that Hicks was the man who wielded the brick.

Three statements were made by defendant, two of which were joint statements with defendant Hicks. The first was made at 11:00 P. M. on May 28, the day after the murder. The second was a joint statement of Nixon and Hicks at 1:00 P. M. on May 29, and the third was in connection with a reenactment of the crime by both defendants at about 5:00 P. M. on the evening of May 29. The first statement was made in the presence of the State's attorney, his assistant, and various police officers. In this statement defendant Nixon stated that he was eighteen years of age, had gone as far as the eighth grade in school, and had been living in Chicago since 1933. When asked whether he was in the Johnson apartment at 4631 Lake Park avenue, on Friday morning, May 27, between five and six o'clock, he stated that he was. His statement, further, was that he and Hicks reached there about 4:30 in the morning; that they had been sitting on the platform of the Illinois Central electric where they remained for about thirty minutes. He stated that he had known Hicks since the previous summer. He stated that they were looking for a place that they could break into to get a radio to sell. When they came to this apartment they found the pane broken out of a rear window and some oilcloth or linoleum put over it; that Hicks went in first and pulled him, Nixon, in behind him. He stated that when he got into the kitchen he took an apple from a basket on the refrigerator and put it in his pocket; that they

went into the living room looking for something to take; that they had a brick with them—Earl Hicks had it; he had gotten it off the railroad track; that, as they looked into the rooms, they saw women asleep in two bedrooms and children asleep in the room where they came in through the window. He stated that they went about the apartment looking for a purse or a watch but did not find anything; that Hicks went into the room of the deceased and that he, Nixon, stood at the door, and when the woman awoke Hicks hit her with a brick; that they ran out and went across a fence or stone wall at the railroad tracks back of the apartment building. He stated that he did not get anything in the apartment except an apple; that they went there to rob and steal and did not touch the woman except Hicks hit her on the head with a brick. He stated that they picked out this apartment because they saw a window open and that it was about daybreak. He also stated that he lost the apple when he jumped over the fence to cross the street. This fence was about five feet high. The apple was afterwards found, showing that it had been partly eaten. He stated also that there was a radio sitting on the table near the window. He described the various rooms, the location of the refrigerator in the kitchen, the rooms in which the children were asleep and the method of coming in through the window. This statement as to the location of the rooms, how they were occupied, and their contents, was corroborated by Margaret Whitten and various other witnesses who later visited the apartment.

When Hicks was brought to the police station their joint statement was taken, which, in effect, corresponded with defendant's first statement, except as to minor details, and except as to who went through the window first and as to who actually struck the deceased with the brick. Each stated the other went through the window first, and each stated the other wielded the brick. Both, in their statement, agreed that they had met, and went to this apartment for the pur-

pose of robbery. They agreed in their statement that they got into the apartment through the window of the children's room. Their statements in the main agreed as to what they did afterwards, with the exception that each stated the other was the one who wielded the brick.

The third statement was made in connection with the reenactment of the crime. Both Hicks and Nixon were taken, in company of numerous officers and three members of the grand jury, to the scene of the crime, where Nixon and Hicks took them over the ground from Forty-seventh street and Lake Park avenue to the Illinois Central depot to a bench on which they both stated they sat, and then took them over the ground where they had been, walked north along the track to where a brick was picked up, and back to this apartment on Lake Park avenue. In this reenactment Nixon took off his shoes and crawled through the window, helped Hicks through and proceeded through the bedroom and kitchen. In the statement made in connection with the reenactment he agreed that he entered first. While in the apartment they pointed out to the officers and grand jurors with them the various parts of the house and the place where this or that member of the family slept. They pointed out the basket of apples which was on the refrigerator and told the story of how the killing occurred, each, however, accusing the other of being the actual perpetrator of the murder. Their statements in connection with the reenactment were taken at that time. Both Nixon and Hicks signed these statements and the other persons present also signed them.

The testimony of the State's attorney, his assistant and the officers present at the time each of these statements was made, was that each had been asked if any promises of reward or immunity had been made to them, and they replied that they had not. They were also asked if any one had mistreated them in any way or forced them to make the statements, and they said they had not. These witnesses

stated that both defendants expressed entire willingness to make the statements and to sign them, which they did.

On the trial of the cause, when preliminary ground was laid for introduction of these statements, counsel for defendant objected. The jury was excluded from the room and a hearing had in the presence of the court. Two of the officers gave testimony that defendant was in nowise mistreated prior to making the statements. Then, over the objection of defendant, he was required to present his testimony. This objection was that the People should be required to present all of their testimony to show the confession was voluntary, before defendant be required to proceed. The objection was overruled, and Nixon testified that he had denied having been at the apartment and knowing anything about the murder, and that while in custody he was taken to the third, fifth and eleventh floors of the police headquarters where he was beaten, hung up with his arms behind him and stripped of his clothing, and that hot electric light bulbs were pressed against his body to compel him to make a statement; that, on the eleventh floor, they thrust him out of the window, holding him by his feet, telling him that if he did not make a statement they would drop him on the elevated railroad track. He stated that no one had asked him whether he had been harmed; that he had made the statements because he had been beaten and was afraid to refuse, and that the statements were false. As to some of the times and places of his mistreatment, he gave names of the officers who he said were present.

In rebuttal, the People produced the testimony of twenty-three police officers, shown to be all of the officers in charge of defendant from the time of his arrest until after the statements and reenactment were made. These witnesses all testified that Nixon was in nowise mistreated and he was not disturbed in his sleep, and no one struck him, blindfolded or beat him. The State's attorney testified that he had talked with defendant about the murder and asked

him whether he was willing to make the statement and to make it voluntarily, and that, in his presence, assistant State's attorney Wilson asked defendant if any one had struck or abused him and he said they had not. The engineer in charge of the building testified that on the eleventh floor, where defendant had stated he was held out of the window by his feet, there was no window that could be opened at any one place more than five inches; that each window had five sections, three of which were permitted to be opened on hinges; that it was impossible to open any section more than five inches, and it was not possible to push a man's body through the openings in those windows. On completion of this hearing, the court overruled defendant's objection to admission of the statements and the three statements were introduced in evidence.

On the trial, Margaret Whitten, sister of the deceased, testified, concerning the happenings on that morning, that she was awakened by screams which she believed to be those of her sister; that she started out of her bedroom and ran into the man whom she identified as defendant. She testified that she was quite close to him. He was going down the hall towards the children's room; that, upon hearing the screams, she first went to the children's room to see how they were, and that the man she met in the hall went into the children's room and out through the window. When asked if she saw the man in the court room she stated that she did, and pointed out the defendant. She testified, also, to a description of the scene and location of the rooms, and that she called the police and a doctor. She also testified that there was a piece of linoleum across the lower part of the window leading to the children's room that had been placed there because one of the children had broken the glass. On cross-examination, she stated that she had said, when defendant was first taken to the apartment, that she was not sure that he was the man she saw. She had never seen defendant before. She described him as wearing dark

clothes, with a dark shirt and zipper jacket. She stated that when the police brought a colored man to the apartment she was not sure he was the man she saw, but thought he was larger. She testified, however, that she saw defendant later at a "show-up" at the police station and identified him, and that she was sure, at the time she testified, that defendant was the man she met in the hall of the apartment.

Testimony was introduced that the blood on the shirt of the defendant was human blood. No attempt was made to determine whose blood it was. This testimony was introduced over the objection of defendant and its admission in evidence is cited and argued here as prejudicial error and will be hereinafter referred to. No objection is raised to instructions. The cause is here on the contentions that the court erred in denying a change of venue and committed error in rulings on the admissibility of testimony.

No error arose in the matter of change of venue. The fact that defendant filed a second motion for such change and did not name the judge who tried the case, but named two judges who had been named in his first motion, together with the fact that he, at no time, so far as the record shows, procured a ruling on his motion, but when the case was reassigned and came to the judge who tried it, he proceeded to trial without such ruling and without objection, strongly indicate an abandonment of any attempt to procure a change of venue.

It is next urged that the court erred in permitting the examination of Dr. Muehlberger, the coroner's chemist, who analyzed the stains on defendant's shirt. The objection was that Dr. Muehlberger's name was not on the indictment or list of witnesses served on defendant, and that defendant was taken by surprise. A motion was made to withdraw a juror when the chemist was called as a witness. Counsel for defendant was given an opportunity to talk with him and argued that, from his statement, it was ap-

parent that his testimony could not be rebutted in less than thirty days. The motion was overruled and the witness allowed to testify. This testimony was that by a test with a sensitized rabbit, known as a precipitin test, made beween June 21 and 23, 1938, he found that the stains on defendant's shirt were human blood. He testified that if he did not have on hand a sensitized rabbit it would take about thirty days to prepare for the test. Counsel for defendant moved to strike his testimony, withdraw a juror and continue for thirty days, on the ground of surprise and to give the defense an opportunity to have such a test made. Defendant's counsel had been advised on the opening statement of the State's attorney, as well as during the selection of the jury, that Dr. Muehlberger would be used to prove the spots to be human blood, yet the failure to include his name in the list of witnesses was not called to the attention of the court until Dr. Muehlberger was called as a witness. There is no showing of any attempt to find whether any laboratory had a sensitized rabbit, necessary to make such a test. Defendant could have demanded the assistance of the People to procure such a test, or, at least, to procure testimony showing no sensitized rabbit available. Nothing of the sort was done. Dr. Muehlberger's testimony shows such test can be made in two days with a sensitized rabbit. Dr. Muehlberger testified that, from the test made, he was unable to say more than that the blood on defendant's shirt was human blood, but that he did not make a test to determine whose blood it was. Defendant's theory as to part of the blood spots was that they were chicken blood, and as to the ones on the sleeve of his shirt, that they came from a cut on his hand. The record shows that defendant's counsel knew what Dr. Muehlberger would testify to a number of days before the People closed their testimony.

It is within the discretion of the court to allow witnesses to testify whose names are not endorsed on the back of the indictment or included in a list of witnesses furnished by

the People, and the exercise of that discretion will not be reviewed unless it appears that defendant has been taken by surprise. The burden is upon him to show that he was surprised. (*People* v. *Touhy*, 361 Ill. 332; *People* v. *Wolf*, 334 id. 218; *People* v. *Strosnider*, 264 id. 434.) The testimony showed only that the blood was human blood. Some of the spots defendant stated were human blood. Under the showing in this record, we are of the opinion that the court's discretion was not abused in this instance.

It is next argued that the court erred in requiring defendant to present evidence of his claim that the confessions made by him were involuntary, before the People had called all their witnesses on the treatment of defendant while in custody, and that, because defendant was required to first give his testimony on that matter, the court placed on him the burden of proving that the confessions were due to mistreatment. Defendant's counsel invoke the well-established rule that where such objection is raised the burden is on the People to prove the confessions were voluntary. When the objection was made the jury was excluded, and, on hearing before the court, two police officers testified that no promises were given or mistreatment of defendant took place. Defendant was then required to proceed with his testimony as to mistreatment, after which some twenty-three police officers, shown to be all who had at any time custody of defendant, testified that no such mistreatment took place. Other witnesses were also called to show, as we have stated, that windows on the eleventh floor of the police station, out of one of which defendant testified he was suspended by his feet with a threat to drop him if he did not confess, could not be opened more than five inches at any one place. There was a full hearing before the court out of the presence of the jury. There was no evidence of mistreatment other than the statement of defendant. He replied, when asked by the State's attorney and other superior officers, that he had been well treated. The rule is that the court,

outside the presence of the jury, must, in such a case, hear such evidence as either side may present as to the circumstances of the confession, and the burden is on the People to offer all proof it has on that subject; but where there has been a full hearing, the decision of the trial court that the confession was voluntary and admissible will not be reversed unless manifestly against the weight of the evidence or unless there has been an abuse of discretion. The court hearing such evidence need not be convinced, beyond a reasonable doubt, that the confession was voluntary. (*People v. Costello,* 320 Ill. 79.) The order of proof is largely within the discretion of the court hearing the evidence. It is more important that there be a full hearing. While the burden of showing that no improper inducement was used to secure the confession is upon the People, and so remains throughout such hearing, it is not necessary that the People produce all their evidence before any evidence is produced on behalf of the defendant. (*People* v. *Fox,* 319 Ill. 606.) In fact, until the defendant describes acts and places of mistreatment the People may not know what their evidence is to be directed to. No error occurred in this regard.

Defendant's counsel next say that the joint statement of Nixon and Hicks was not admissible because not freely made but was the result of mistreatment; that not all persons present when such mistreatment took place were called to testify and that the statement was made by Nixon as a result of fear of repetition of such mistreatment. His testimony was that he made the statement and signed it to keep from being beaten or killed, and through fear of further mistreatment, and that the statement made by him was not true.

Counsel say that the People did not produce any witnesses who were with defendant prior to making the first two statements. This claim, as we have stated, is not borne out by the record. The record discloses no fact or circumstance corroborating his testimony as to mistreatment, while

it does disclose circumstances tending to disprove it. He complained to no one at any time that he had been mistreated and told all who inquired, including the State's attorney, that he had not been mistreated. While this could have been the result of fear if he was beaten and threatened, yet no fact supports his story of mistreatment. From one to a number of witnesses denied each fact stated by him. In those cases where he named those present, all denied any mistreatment. As we have pointed out, twenty-three police officers, covering all the time he was in custody and including every officer who was in his presence during that time, denied his statements of mistreatment. Defendant's counsel do not name or mention any one not called, but appear to content themselves with the assertion that not all were called. No one saw any marks or bruises on him. He and Hicks were taken with police officers and others to the scene of the crime where they reenacted it. Defendant testified on the trial that he was taken to Ninety-fifth street and Stony Island avenue. All who were with him testified they were not near Ninety-fifth street. Officers who he stated were present at some of the places, testified that they were elsewhere.

Three statements were made by defendant. The first on May 28, the day after the crime, the second a joint statement of defendant and Hicks on May 29, at 1:00 P. M., and the third by both at about 5:00 P. M. on the same day at the scene of the reenactment of the crime. All these statements agree except as to who wielded the brick with which the deceased was murdered. Defendant, in all his statements, declared Hicks wielded the brick, and in the two joint statements Hicks declared that defendant was the one who wielded the brick.

These statements, and the reenactment of the crime, agree with the testimony of Margaret Whitten, sister of the deceased, except that she was not in the room of deceased when the murder occurred. The reenactment tallied

with defendant's statement and the joint statements except as to who wielded the brick and as to other minor differences unnecessary to detail here. These statements concerning the description of the apartment and its contents could not have been so accurately made by defendant and Hicks if they were not there. These facts strongly contradict defendant's testimony on the trial that he was not there.

It is next contended that the trial court erred in admitting in evidence the joint statement in which Hicks participated and in which he stated that defendant wielded the brick, which the defendant denied, and by not putting Hicks on the stand, the defendant was deprived of the right to face and cross-examine his accuser and thereby the court violated his constitutional right to face his accuser. It appears from the record that the police knew nothing of Hicks until told by defendant that Hicks was with him and where he could be found. Hicks admitted he was with defendant and told the same story except as to who did the actual killing. Defendant's constitutional rights were not violated, for two reasons: First, according to the joint statement of both, both were in the house at the time the blow was struck. Both were there to commit burglary. Under those facts, regardless of who wielded the brick, both, in the law, are guilty of murder. Each assented to the statement of the other that both were present when the crime was committed, therefore, as to the question of guilt, the difference in the statements was immaterial. On the question of punishment, the testimony of Margaret Whitten identifying Nixon, and the evidence of human blood on his clothing, sufficiently established that Nixon wielded the brick. Second, defendant might, had he seen fit to do so, have requested the court to put Hicks on the stand as the court's witness for the purpose of cross-examining him, without being bound by his testimony. Nothing of the sort was done or attempted. It is said this amounts to receiving an unsworn accusation of

Hicks against defendant. Two Federal cases are cited. The situation here is not the same as in *Poole* v. *United States,* 97 Fed. (2d) 423, where there was brought to the jury, in an indirect manner, knowledge that a co-defendant not on trial, and who did not testify, had previously identified the defendant as one who had supplied her with forbidden drugs. That situation was denied *in toto* by the defendant. Here, Hicks had pleaded guilty; both, as we have said, were guilty of murder. Nor is *Yep* v. *United States,* 83 Fed. (2d) 41, in point. There, the statement not under oath objected to, was made by one in no way connected with the crime, in the presence of the accused. Defendant's statement, as well as Hicks', showed a conspiracy on their part to commit burglary. Thus the statements of both, though not under oath, were competent. Where a statement is made in the presence of the accused and he makes reply admitting the truth of the statement either wholly or in materially incriminating parts, both the statement and his reply thereto are competent evidence. *People* v. *Lehne,* 359 Ill. 631; *People* v. *Cardinelli,* 297 id. 116; *People* v. *Harrison,* 261 id. 517; *Commonwealth* v. *Trefethen,* 157 Mass. 180, 31 N. E. 961.

It is next urged that the court erred in admitting the testimony of police officer John L. Sullivan and deputy chief of detectives Walter G. Storms, concerning statements of Hicks that defendant wielded the brick. It is a sufficient answer to this contention to say that no objection was made to that testimony when given.

It is also argued that the assistant State's attorney committed error in his closing argument by referring to defendant as a "brick killer," and by referring to the joint statement of defendant and Hicks in which each declared the other held the brick. It is, likewise, a sufficient answer to this contention to say that no objection was offered when the argument was made.

The record discloses a full and fair trial of the charge against defendant. The showing of guilt against him was conclusive. Facts and circumstances shown, as well as the testimony of witnesses concerning the voluntary character of his confession, may well have caused the jury to disbelieve his testimony on the trial. The verdict of the jury is amply supported by the evidence. No error requiring a retrial of the cause intervened on the trial. The judgment of the criminal court of Cook county is affirmed. The clerk of this court is directed to enter an order fixing June 16, 1939, as the time when the original sentence of death entered in the criminal court of Cook county shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the sheriff of Cook county.

*Judgment affirmed.*