(No. 36680.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MARY SAISI, Plaintiff in Error.

*Opinion filed March 23, 1962.*

Bellows, Bellows & Magidson, and Andrew Euzzino, all of Chicago, for plaintiff in Error.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach, and E. Michael O'Brien, Assistant Attorneys General, and John T. Gallagher and Marvin E. Aspen, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Klingbiel delivered the opinion of the court:

Mary Saisi and Richard Lansing were indicted in the criminal court of Cook County for the murder of Peter Saisi, the husband of Mary Saisi. Lansing entered a plea of guilty and was sentenced to the penitentiary for life. Mary Saisi, hereinafter referred to as defendant, was tried by the court without a jury, found guilty, and sentenced to a term of 60 years. She has sued out a writ of error to review her conviction, contending that guilt was not proved beyond a reasonable doubt and that error was committed in admitting into evidence a "joint statement" of herself and Lansing.

The evidence shows that on October 27, 1958, at approximately 8:30 P.M. Lansing went to the Saisi home. After being admitted by defendant he proceeded to the basement, which defendant's husband used as an office. There he concealed himself in a closet to await the arrival of Saisi, who had not yet come home. Later Saisi came home and went to the basement, where he started to undress. Lansing then walked out of the closet, forced Saisi to lie down on the floor, and took some money from Saisi's trousers. When Saisi started to get up, Lansing shot him in the head, killing him. He left by way of the back basement door.

When the police arrived defendant told them that about 10 minutes after her husband came home she heard voices in the basement and started down the stairway, that when she was about half way down she saw him lying on the floor pleading with someone, and that a colored man with a pistol in his hand ordered her back upstairs. She further related to the police that on the way upstairs she heard a shot, and ran to the apartment of her sister-in-law on the second floor to call the police. She gave what purported to be a description of the Negro and said he had a companion whom she could not see well enough to describe. She persisted in this version of the occurrence for several days, but later admitted it was Lansing who killed her husband. At the trial she testified that after hearing a shot she started down the stairs and that Lansing then held a gun on her, threatening to kill her and her children unless she said it was a colored man.

Richard Lansing, defendant's paramour, testified that he had known the defendant for about six months prior to October 27, 1958, but was unacquainted with her husband. He identified the gun with which the murder had been committed and related that in August or September preceding the murder he had bought it with money given to him by defendant for that purpose. He further testified that in the

early evening of October 27, 1958, he was at the apartment of one Lorraine Pflieger (whose name at the time of the trial was Lorraine Wright). Defendant and her three children were also there. She told him that "tonight was the night" and that he should call her at her home about 8:30 P.M. He accordingly called her later that evening and then went to the Saisi home. Defendant showed him around the basement and told him to shoot her husband there. After he had been waiting alone in the basement for a while defendant came to the head of the stairs and said her husband was coming. Peter Saisi shortly came down the stairs and started undressing. Lansing walked out of the closet where he had been hiding, made Saisi get on the floor, removed the money from his pants, and then as Saisi started to get up he shot him in the head.

Lansing further testified that he shot Peter Saisi "to get half the insurance money," and that the preceding August, when they were in a tavern together, the defendant told him she would like to get rid of her husband permanently, so they could get married. Defendant had given him money on a number of occasions, but he did not get part of the insurance money. Other evidence disclosed that Saisi's life was insured for $19,000 in case of natural death, or $33,000 in the event death was accidental.

Lorraine Wright testified that defendant was visiting her at her home about 6:00 P.M. on October 27, 1958, and that Lansing was also present. In the course of the conversation defendant said she and Peter did not get along very well. She used profanity in referring to him. At Lorraine's request Lansing thereafter drove the two women and their children to a certain street location, to look for the car of Lorraine's boy friend. On the way back to Lorraine's home defendant and her children were left off. Late that night, after 11:00 o'clock, Lansing came back to the witness's home and stayed about 20 minutes. He did not say at that time that he had shot and killed Peter Saisi.

The prosecutor introduced in evidence a signed statement taken from defendant on November 29, 1958, in which she admitted facts indicating participation in the robbery of her husband but denied any knowledge that Lansing would kill him. Also admitted in evidence was a joint statement with Lansing taken the same day, in which he related the details of the murder and implicated defendant therein, and in which defendant said she knew Lansing was going to hold up her husband but "didn't know he had a gun." She admitted having given Lansing $50, but denied it was for purchasing a gun.

Defendant testified on her own behalf, denying that she plotted with Lansing to rob or kill her husband. She related that on the night of the murder Lansing came to her home, after his telephone call, and said he wanted to talk to Peter. She replied that Peter would not give him any money, whereupon Lansing went downstairs. When Peter arrived she told him Lansing was down there. He replied that if it was money Lansing wanted he did not want to see him. Peter went to the basement and she remained upstairs watching television. She later heard voices and a shot, and ran down the stairs screaming. Lansing came to the stairs with a gun and swore at her, telling her to say it was a colored man that did it or else he would kill her and the children. Defendant further testified that she did not tell the police because she was afraid Lansing would carry out his threat.

In support of her contention that the evidence is insufficient defendant argues that Lansing's testimony is not worthy of belief because he had a criminal record as a thief and robber. It is further insisted that his testimony is discredited by the fact that after his arrest he wrote letters to her and her sister from jail demanding money and stating that "Without me here to testify, I am sure you will feel a lot more confident of an acquittal." We do not think the matters relied on would justify this court in holding the

testimony unworthy of belief, nor can we agree with defendant that there is no corroboration of Lansing's testimony. His account finds support in testimony of police officers and other witnesses to collateral facts and circumstances, as well as in the testimony, admissions and contradictory statements of defendant herself. The sufficiency of the testimony in this case depends upon the credibility of the witnesses. Where such is the case it is primarily for the trial court, in the absence of a jury, to determine the weight to be accorded their testimony. A reviewing court will not set aside a conviction which depends upon matters of this kind unless it is necessary to prevent apparent injustice. (*People* v. *Lucky,* 21 Ill.2d 501; *People* v. *Franceschini,* 20 Ill.2d 126.) No such necessity appears here.

Defendant claims the court erred in denying her motion for a new trial which alleged, among other grounds, the existence of newly discovered evidence. A hearing was had on the motion at which there was introduced the testimony of one Arthur Cole, a fellow prisoner of Richard Lansing in the county jail. Cole related that Lansing told him, when they were in jail together, that the State had promised Lansing a "new trial" if he would testify against Mary Saisi. According to the witness, Lansing had said that she was innocent of the crime, that he had killed the deceased without her knowledge, and that he testified at her trial because she would not give him the insurance money. Cole had been sentenced to jail for receiving money under false pretenses. In denying the motion the trial court said it was not impressed with the truthfulness of the testimony and that the witness indicated he had a grudge against the law enforcement agencies. We cannot say the judge was wrong in disbelieving this testimony, or in denying the motion for a new trial. He had full opportunity to observe the witness as the latter testified, and was in a better position to decide the truthfulness and weight of the testimony than is this court.

Defendant insists the court erred in admitting in evidence the joint statement of herself and Lansing. She argues that it consists mainly of accusations or charges by Lansing, and that the record shows she did not acquiesce in them. In the signed statement Lansing said, in the presence of defendant, that she entered into a plot with him to kill her husband, that she gave him money to buy the gun, that she helped to hide him in the basement, and that she knew in advance he was going to kill her husband. In her part of the joint statement defendant said that she did not know Lansing was going to shoot her husband, and that she did not know he had a gun. She stated, however, that she knew Lansing was going to hold up her husband and take his money. At the hearing on defendant's motion to suppress, testimony of police officers was introduced to the effect that at the time of the statement defendant called Lansing a liar and denied having had anything to do with the murder.

It appears that defendant admitted the truth of parts of Lansing's statement—*e.g.,* that she had given him the sum of $50 and that she knew he planned to hold up the deceased —but denied the rest of his story and called him a liar. While the portions denied by her should have been excluded (cf. *People* v. *Lehne,* 359 Ill. 631, 648), we think that under the circumstances of this case failure to do so does not amount to prejudicial error. The content was nothing more than the facts to which Lansing testified in court, and the trial was before the court without a jury. In such cases it is presumed that the trial judge considered only competent evidence in reaching his decision. *People* v. *Cox,* 22 Ill.2d 534.

After careful examination we conclude that there is ample, competent evidence in this record to sustain the conviction, and that any error in admitting the joint statement in its entirety did not prejudice the defendant. (*People* v. *Strader,* 23 Ill.2d 13.) The judgment of the criminal court of Cook County is affirmed.          *Judgment affirmed.*