(No. 36899.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EARL WILLLIAM HANSON, Plaintiff in Error.

*Opinion filed May 20, 1964.*

ARTHUR M. LERNER, of Champaign, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and RALPH D. GLENN, State's Attorney, of Charleston, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and MARK B. HUNT, JR., Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Earl William Hanson, Billie Dean Pethtel and Dale Edward Scott were indicted for the murder of Thomas J. Shanks. A jury in the circuit court of Coles County found Hanson, herein referred to as defendant, guilty and fixed his sentence at 199 years confinement in the penitentiary. A writ of error has been issued to review his conviction.

Thomas J. Shanks and his son Raymond were partners and owners of the Shanks Packing Company in Mattoon.

About 12 minutes after 6 o'clock of the morning of June 5, 1959, Raymond Shanks arrived at the office of the Packing Company and found his father slumped over his desk and groaning. His father was bleeding from wounds on the head, there was blood splattered around the room, the door of the safe was open and papers were strewn on the floor. His father was taken to the hospital where he died about 1 o'clock that afternoon. The cause of death was attributed to several severe blows on the head from a blunt instrument.

Pethtel, aged 19, testified that defendant, aged 32, is his uncle. He gave the following account of events leading to the crime. On June 3 he and defendant left Robinson to go to Chicago and look for a job. They got as far as Tuscola where they spent the evening and then went south to Mattoon the next morning. They met Scott there at a restaurant. Defendant had become acquainted with Scott when both were incarcerated at the Menard Penitentiary but Pethtel and Scott were unacquainted. Pethtel said that defendant and Scott discussed committing a robbery and Scott said to meet him later that evening. The three met at 8:30 P.M. and after riding around stopped at a restaurant in Mattoon between 12:30 and 1:00 A.M.

In this restaurant Scott and defendant discussed robbing the Shanks Packing Company where Scott worked. Pethtel agreed to go with them and they all agreed to split the proceeds of the robbery equally. They left the restaurant and drove south of Mattoon where defendant had hidden a shotgun. They got the shotgun and some gloves and drove to within 2 blocks of the packing company, parked the car, and walked to the building. Scott entered and opened the door for defendant and Pethtel. Pethtel and defendant put on butcher smocks and made masks from some shirts obtained in the building. All three waited until Shanks arrived about 10 minutes before 6:00

o'clock. When Shanks entered the building defendant pointed the shotgun at him, and Pethtel, at defendant's direction, hit Shanks slightly on the shoulder with a piece of iron pipe but not hard enough to knock him down. Defendant then took the pipe and hit Shanks on the head knocking him to the floor. The defendant took the keys to the safe from Shanks, broke the glass in the office door, entered the office and opened the safe door. The safe had a second door secured by a combination lock. Defendant made Shanks get up and open the second door to the safe. Defendant looked through the safe and the three then got away in a truck belonging to the packing company. They drove to defendant's car. Defendant and Pethtel dropped Scott at his home and then drove to Casey arriving about 7:00 A.M. where they stopped at a restaurant for coffee. They later returned to Robinson.

Scott's version of the crime was about the same as Pethtel's version. He testified that he had seen defendant a week before June 4 at which time they discussed a robbery. Scott gave defendant a shotgun he had bought for hunting rabbits and did not see him again until June 4. At that time he was driving a delivery truck for Shanks Packing Company. Defendant was with Pethtel but Scott did not know Pethtel. Defendant asked Scott if he had anything "lined up" and Scott said no. About 8:30 P.M. that evening defendant called him and he met defendant and Pethtel. His narration of events and places they went was the same as Pethtel's except that Scott stated they discussed burglarizing the packing company after they got the shotgun and not at the restaurant in Mattoon. Scott said he entered the building through a second story window and opened the door for Pethtel and defendant. He did not wear a butcher's smock or mask because he was not going to be seen by Shanks. When Shanks was about to enter the building he went to the rear of the

building and opened the door for the getaway. He did not see the assault on Shanks. As the three were driving away in the truck, he heard Pethtel say to defendant, "I hope you didn't hit him too hard", and defendant reply, "I don't believe I did, but he'll have a headache when he wakes up." On cross-examination Scott admitted that he had embezzled money from Shanks and that the shotgun had been stolen.

Signed confessions by Pethtel and Scott containing the same facts to which they testified at the trial, along with a statement of defendant admitting those confessions to be 90 to 99 per cent true, were admitted in evidence. A piece of paper with a heelprint found at the scene of the crime was admitted in evidence after it was shown that the size, style and a peculiarity in the heel of defendant's shoe corresponded exactly with the print on the paper.

Defendant gave the following account of his actions during the time in question. He testified that he met Scott between 1955 and 1957 when they were both serving sentences at Menard Penitentiary. He said he was in Mattoon about two weeks before June 4 standing on the street when Scott drove past him and recognized him. They had a general conversation and Scott said he wanted to commit a robbery. Scott also talked about selling his car and defendant was interested in buying a car. A week later he went to the packing company to see Scott concerning the purchase of the car. At quitting time they went to where Scott lived. Scott brought out a shotgun and the two left in Scott's car. Scott drove just south of Mattoon where he stopped and told defendant to put the shotgun in the weeds.

He said that on June 3 he saw his nephew, Billie Dean Pethtel, in Robinson and his nephew asked him if he would take him to Chicago to look for a job. They drove to Tuscola where they spent the night. The next morning

defendant decided to see a friend near Arcola, which he did, and they then drove south to Mattoon. Defendant happened to see Scott and told Pethtel that Scott could tell him if there was a job in Mattoon. Defendant told Scott that Pethtel wanted a job and Scott said "come back tonight and I will let you in on a job." Defendant said he wanted no part of it, and he and Pethtel left for Robinson. Later that day Pethtel decided to go to Chicago again and defendant agreed to take him. They left Robinson about 7:00 P.M. and started for Chicago via Mattoon. On the way Pethtel asked defendant about Scott and defendant said he had met him at Menard Penitentiary and that Scott was a "stool pigeon". Pethtel insisted on seeing Scott, so defendant agreed to stop and call him, although he warned his nephew that he would get into trouble with Scott. The three of them drove around finally stopping at the restaurant about 12:30 or 1:00 A.M.

He further testified that as they were leaving the restaurant, Scott asked him if he had taken the shotgun. Defendant said no and Scott said he could not find it. Defendant then said "I will go help you find it." On the way to the weeded area to find the shotgun, defendant asked Pethtel what he was going to do and Pethtel said he was going to hitch-hike home. Defendant then told Pethtel what type of man Scott was, that the shotgun was stolen and that Scott planned a robbery. Defendant found the shotgun for Scott where it had been hidden just south of Mattoon. Pethtel stayed with Scott and defendant left in his car for Chicago. He drove to a point north of Tuscola where he slept in his car from 3:00 o'clock A.M. until 6:00 o'clock A.M. When he awoke he decided the weekend would not be a good time to go to Chicago and started south again. He stopped at a restaurant in Tuscola for breakfast at 6:00 A.M. He drove east to Paris and then south to Robinson. Later that day he saw Pethtel in Robinson. He asked Pethtel what he did the night before

and Pethtel said he did not do anything. On June 10 defendant was arrested as he left his home.

A waitress at the restaurant in Tuscola corroborated defendant's alibi when she testified that defendant ate breakfast there about 6 o'clock A.M. on the morning of June 5. His alibi was weakened, however, when the waitress at the restaurant in Casey corroborated Pethtel's testimony that he and defendant had coffee there at 7:00 o'clock A.M. on June 5.

It is first argued that the court erred in admitting the confessions of Pethtel and Scott in evidence. The record shows that on the evening of June 12 defendant was placed in the presence of Scott and Pethtel. Scott's written confession was shown to him page by page and he acknowledged audibly that he had initialed each page and signed the confession and that the confession was true. The same procedure was followed with respect to Pethtel. The confessions were then read to defendant. A court reporter made notes on defendant's response, the material part of which is as follows:

"Q. Do you want to confirm or deny any part of this?
A. I don't know.
Q. It is all true, is it?
A. No.
Q. How much of it is true?
A. The biggest part, ninety per cent, maybe ninety-nine per cent.
Q. Are you the man who killed the old man, Mr. Shanks?
A. Could be.
Q. Are you the man who hit him with the pipe?
A. I did, yes, but I am not the only one.
Q. Who else did?
A. You have the confessions there. What else do you need?
Q. Tell us where they are lying, if they are lying. If anybody said anything like that to me or about me,

I'd deny it if it wasn't true. You said ninety-nine per cent is true. Tell us what the one per cent is that is not true.

A. There is a lot in there that is not true. It is all minor stuff, as far as that goes, except one particular thing, about who hit the old man and who wasn't hitting him."

It is well established that when an incriminating extrajudicial statement of a third person is admitted to be true by the accused, the statement by adoption becomes his own and is admissible in evidence at his trial. (*People* v. *Saisi,* 24 Ill.2d 274; *People* v. *Nixon,* 371 Ill. 318; *People* v. *Lehne,* 359 Ill. 631; *People* v. *Harrison,* 261 Ill. 517.) Thus, the statements of Scott and Pethtel and defendant's statement adopting them were all admissible. *People* v. *Nixon,* 371 Ill. 318; *People* v. *Harrison,* 261 Ill. 517.

It is next argued that defendant's confession was not voluntary. The defendant was arrested on the morning of June 11 and taken to the Crawford County jail where his shoes were removed for examination of the heels. That afternoon he was moved to the Coles County jail. On the evening of June 12, he made his confession. The defendant's detention was legal and his own testimony shows that no one physically abused him; that the total questioning over the two-day period did not cover much more than two hours; that he was not required to walk more than a total of 60 to 70 feet to get from the Crawford County jail to the car and from the car to the Coles County jail and suffered no discomfort from these walks; that he was handcuffed on the 1½ hour ride to Mattoon, but he suffered no discomfort; and that he was properly fed and had opportunities to sleep. He was advised that he did not have to make a statement and was advised that he could make a telephone call if he so chose. Although he did not deny making the statement, he said he made it because he had a headache, an interrogator told him he

would "burn", and from past experience he knew the police would beat him if he did not make a confession. The interrogator denied that he told defendant he would burn and persons present at the time defendant made his statement testified that no threats or promises were made to defendant. On the basis of this record we hold that the trial court did not err in holding that defendant's confession was voluntary.

Although defendant does not deny making the statement, he argues that it should not have been admitted into evidence because he did not sign it. We have held that a statement may be proved by other methods, including the testimony of the court reporter who took it, (*People* v. *Berryman,* 13 Ill.2d 229) as was done in this case.

Defendant next argues that he should have been permitted to cross-examine Scott and Pethtel as to whether promises or threats had been made by the police in order to obtain their confessions. In support of this argument cases are cited which hold that great latitude should be allowed the defendant in cross-examining a co-defendant or accomplice as to his motive or purpose for testifying against him. In this case defendant was permitted, and he did, cross-examine Scott and Pethtel as to whether promises of leniency had been made to induce them to testify. The court would not allow him to cross-examine these witnesses, however, as to promises or threats that may have induced their confessions.

No cases have been cited which deal with the issue of whether a defendant may question the voluntariness of a co-defendant's confession which he has voluntarily and expressly adopted as his own—but we feel that to state the question is to answer it. If the defendant voluntarily adopted the statement as his own, the motives or purposes of Scott and Pethtel for giving the statements are immaterial and irrelevant in defendant's trial.

Complaint is also made of the admission of the heel-

print found at the scene of the crime. Captain Clark of the Mattoon police department testified that he had made a routine check of the packing company between 3:00 and 4:00 o'clock A.M. on the morning of June 5 and noted that the office safe was closed at that time and there was nothing unusual in the office. Shortly after 6:00 o'clock A.M. he arrived at the scene of the crime and noticed the safe open and the piece of paper with the heelprint lying on the floor in front of the safe. An expert from the State Criminal Bureau of Identification and Investigation testified that he had examined the heelprint and defendant's shoes. This examination revealed that the heelprint and the left heel of defendant's shoe were the same size, the wear along the outer edge was the same, the design was the same, and the 9 striations on the outer circumference with a small defect in the 4th ridge counting upward on the outside were the same. He concluded that he could find no dissimilarities in the print and the heel which would indicate that the heel did not make the print.

In *People* v. *Zammuto,* 280 Ill. 225, this court considered the admissibility of footprints to prove identity and stated, "It is true that evidence concerning foot-prints may tend to prove identity, as in the case of *Schoolcraft* v. *People,* 117 Ill. 271, where a toe turned inward, or in the manner of walking, as in *Carlton* v. *People,* 150 Ill. 181, where defendant was lame and walked with a kind of hop and the foot he limped on corresponded with the tracks, but such evidence is of no effect where, as in the case of *Dunn* v. *People,* 158 Ill. 586, there was no peculiarity of the foot-prints." We believe that there was sufficient evidence to connect the heelprint with defendant and with the crime to make it admissible in evidence.

Defendant also contends that the court erred in refusing his instruction No. 1 covering the weight to be given an admission. The record does not support defendant's statement in his brief that no like instruction was

given by the court. People's instruction No. 31 was to the same effect as defendant's instruction No. 1 and was given by the court without objection from the defendant. We find no error in refusing defendant's instruction No. 1. Furthermore, the court gave 49 of the 64 tendered instructions, about ½ of which were tendered by the defendant. As we have pointed out, "Counsel have little room to complain of error in instructions where they burden the trial court with the labor of weeding out a lot of miscellaneous stock instructions in the short time available for this task of the court." *People* v. *Davis,* 10 Ill.2d 430, 443, and *People* v. *Burns,* 300 Ill. 361, 365.

It is then argued that a new trial should have been granted because the jury was separated. Defendant asserts that on one day of the trial a juror was driven in a separate car from the other eleven jurors by a deputy sheriff; that while eating their meals at restaurants, the jury sat close to the general public; and that one evening two lady jurors were walking around the motel where the jury was lodged unattended by a bailiff.

The record indicates that the juror who was driven by the deputy sheriff rode in one car while the rest of the jurors were divided between two other cars and that all three cars travelled together. The separation of the jury on this occasion was necessitated by the mode of transportation. The testimony of the bailiffs indicates that the seating of the jury in restaurants was supervised so that they could not overhear any discussions by the general public; that no juror had any conversation or contact with anyone not on the jury outside the presence of the bailiff; and that all telephone calls to and from the jurors were handled by a bailiff. The court could properly have found that there was no improper separation of the jury. In any event this court has held that "where the separation [of the jury was] * * * by inadvertence or carelessness of the jurors or of the officer, or of both, the verdict will

not be set aside unless it is clearly shown the jurors were operated on in some way to the prejudice of the prisoner." (*People* v. *Casino,* 295 Ill. 204, 211; see also *People* v. *Tilley,* 406 Ill. 398; *People* v. *Fisher,* 340 Ill. 216; *People* v. *Strause,* 290 Ill. 259.) In this case no prejudice was shown.

Defendant also contends that there is not sufficient evidence to support the verdict. This contention is based on the assertion that defendant's confession and the heelprint should have been excluded and the jury should have believed his alibi rather than the testimony of the two accomplices. As we have pointed out, the defendant's confession and the heelmark were properly admitted into evidence and it was within the jury's province to believe the People's evidence rather than defendant's alibi. We hold there was sufficient evidence to support the verdict.

The judgment of the circuit court of Coles County is affirmed.

*Judgment affirmed.*